# UNITED STATES *v.* NAVAJO NATION

No. 01–1375.   Argued December 2, 2002—Decided March 4, 2003

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 514.

*Deputy Solicitor General Kneedler* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Assistant Attorney General Sansonetti, Deputy Assistant Attorney General Clark, Gregory G. Garre, Todd S. Aagaard,* and *R. Anthony Rogers.*

*Paul E. Frye* argued the cause for respondent. With him on the brief were *Richard W. Hughes, David O. Stewart, Samuel J. Buffone, Levon B. Henry,* and *Richard B. Collins.**

---

*\*V. Thomas Lankford* and *Terrance G. Reed* filed a brief for the Peabody Coal Co. et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Jicarilla Apache Nation et al. by *Jill Elise Grant;* for the Mississippi Band of Choc-

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the Indian Mineral Leasing Act of 1938 (IMLA), 52 Stat. 347, 25 U. S. C. § 396a *et seq.*, and the role it assigns to the Secretary of the Interior (Secretary) with respect to coal leases executed by an Indian Tribe and a private lessee. The controversy centers on 1987 amendments to a 1964 coal lease entered into by the predecessor of Peabody Coal Company (Peabody) and the Navajo Nation (Tribe), a federally recognized Indian Tribe. The Tribe seeks to recover money damages from the United States for an alleged breach of trust in connection with the Secretary's approval of coal lease amendments negotiated by the Tribe and Peabody. This Court's decisions in *United States* v. *Mitchell,* 445 U. S. 535 (1980) *(Mitchell I),* and *United States* v. *Mitchell,* 463 U. S. 206 (1983) *(Mitchell II),* control this case. Concluding that the controversy here falls within *Mitchell I*'s domain, we hold that the Tribe's claim for compensation from the Federal Government fails, for it does not derive from any liability-imposing provision of the IMLA or its implementing regulations.

## I

### A

The IMLA, which governs aspects of mineral leasing on Indian tribal lands, states that "unallotted lands within any Indian reservation," or otherwise under federal jurisdiction, "may, with the approval of the Secretary . . . , be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities." § 396a. In addition "to provid[ing] Indian tribes with a profitable source of revenue," *Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S.

taw Indians by *Charles A. Hobbs* and *Christopher T. Stearns;* and for the National Congress of American Indians by *Jeffrey S. Sutton* and *John E. Echohawk.*

163, 179 (1989), the IMLA aimed to foster tribal self-determination by "giv[ing] Indians a greater say in the use and disposition of the resources found on Indian lands," *BHP Minerals Int'l Inc.*, 139 I. B. L. A. 269, 311 (1997).

Prior to enactment of the IMLA, decisions whether to grant mineral leases on Indian land generally rested with the Government. See, *e. g.*, Act of June 30, 1919, ch. 4, § 26, 41 Stat. 31, as amended, 25 U. S. C. § 399; see also *infra*, at 509 (describing § 399). Indian consent was not required, and leases were sometimes granted over tribal objections. See H. R. Rep. No. 1872, 75th Cong., 3d Sess., 2 (1938); S. Rep. No. 985, 75th Cong., 1st Sess., 2 (1937); 46 Fed. Cl. 217, 230 (2000). The IMLA, designed to advance tribal independence, empowers Tribes to negotiate mining leases themselves, and, as to coal leasing, assigns primarily an approval role to the Secretary.

Although the IMLA covers mineral leasing generally, in a number of discrete provisions it deals particularly with oil and gas leases. See 25 U. S. C. § 396b (requirements for public auctions of oil and gas leases); § 396d (oil and gas leases are "subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by [the] Secretary"); § 396g ("[T]o avoid waste or to promote the conservation of natural resources or the welfare of the Indians," the Secretary may approve leases of Indian lands "for the subsurface storage of oil and gas."). The IMLA contains no similarly specific prescriptions for coal leases; it simply remits coal leases, in common with all mineral leases, to the governance of rules and regulations promulgated by the Secretary. § 396d.

During all times relevant here, the IMLA regulations provided that "Indian tribes . . . may, with the approval of the Secretary . . . or his authorized representative, lease their land for mining purposes." 25 CFR § 211.2 (1985). In line with the IMLA itself, the regulations treated oil and gas leases in more detail than coal leases. The regulations re-

garding royalties, for example, specified procedures applicable to oil and gas leases, including criteria for·the Secretary to employ in setting royalty rates.  §§ 211.13, 211.16, 211.17. As to coal royalties, in contrast, the regulations required only that the rate be "not less than 10 cents per ton." § 211.15(c).  No other limitation was placed on the Tribe's negotiating capacity or the Secretary's approval authority.[1]

## B

The Tribe involved in this case occupies the largest Indian reservation in the United States.  Over the past century, large deposits of coal have been discovered on the Tribe's reservation lands, which are held for it in trust by the United States.  Each year, the Tribe receives millions of dollars in royalty payments pursuant to mineral leases with private companies.

Peabody mines coal on the Tribe's lands pursuant to leases covered by the IMLA.  This case principally concerns Lease 8580 (Lease or Lease 8580), which took effect upon approval by the Secretary in 1964.  App. 188–220.  The Lease established a maximum royalty rate of 37.5 cents per ton of coal, *id.,* at 191, but made that figure "subject to reasonable adjustment by the Secretary of the Interior or his authorized representative" on the 20-year anniversary of the Lease and *every ten years thereafter, id.,* at 194.

As the 20-year anniversary of Lease 8580 approached, its royalty rate of 37.5 cents per ton yielded for the Tribe only "about 2% of gross proceeds."  263 F. 3d 1325, 1327 (CA Fed. 2001).  This return was higher than the ten cents per ton minimum established by the then-applicable IMLA regula-

---

[1] In 1996, well after the events at issue here, the minimum rate on new coal leases was increased to "12½ percent of the value of production produced and sold from the lease."  61 Fed. Reg. 35658 (1996); 25 CFR § 211.43(a)(2) (1997).  The amended regulations further state, however, that "[a] lower royalty rate shall be allowed if it is determined to be in the best interest of the Indian mineral owner."  § 211.43(b).

tions. See 25 CFR § 211.15(c) (1985). It was substantially lower, however, than the 12½ percent of gross proceeds rate Congress established in 1977 as the minimum permissible royalty for coal mined on federal lands under the Mineral Leasing Act. See Pub. L. 94–377, § 6, 90 Stat. 1087, as amended, 30 U. S. C. § 207(a). For some years starting in the 1970's, to gain a more favorable return, the Tribe endeavored to renegotiate existing mineral leases with private lessees, including Peabody. See App. 138–139, 143–144.

In March 1984, the Chairman of the Navajo Tribal Council wrote to the Secretary asking him to exercise his contractually conferred authority to adjust the royalty rate under Lease 8580. On June 18, 1984, the Director of the Bureau of Indian Affairs for the Navajo Area, acting pursuant to authority delegated by the Secretary, sent Peabody an opinion letter raising the rate to 20 percent of gross proceeds. *Id.*, at 8–9.

Contesting the Area Director's rate determination, Peabody filed an administrative appeal in July 1984, pursuant to 25 CFR § 2.3(a) (1985). 46 Fed. Cl., at 222.[2] The appeal was referred to the Deputy Assistant Secretary for Indian Affairs, John Fritz, then acting as both Commissioner of Indian Affairs and Assistant Secretary of Indian Affairs, 263 F. 3d, at 1328. In March 1985, Fritz permitted Peabody to supplement its brief and requested additional cost, revenue, and investment data. 46 Fed. Cl., at 222. He thereafter appeared ready to reject Peabody's appeal. *Ibid.*; App. 89–97 (undated draft letter). By June 1985, both Peabody and the Tribe anticipated that an announcement favorable to the Tribe was imminent. *Id.*, at 98–99.[3]

---

[2] As required by the regulations, see 25 CFR § 2.11 (1985), Peabody served its notice of appeal on the Tribe, which exercised its right to file a response, see § 2.12.

[3] The regulations then in effect required the Deputy Assistant Secretary to "[r]ender a written decision on the appeal" or "[r]efer the appeal to the Board of Indian Appeals" (Board), "[w]ithin 30 days after all time for

On July 5, 1985, a Peabody Vice President wrote to Interior Secretary Donald Hodel, asking him either to postpone decision on Peabody's appeal so the parties could seek a negotiated settlement, or to rule in Peabody's favor. *Id.*, at 98–100. A copy of Peabody's letter was sent to the Tribe, *id.*, at 100, which then submitted its own letter urging the Secretary to reject Peabody's request and to secure the Department's prompt release of a decision in the Tribe's favor, *id.*, at 119–121. Peabody representatives met privately with Secretary Hodel in July 1985, 46 Fed. Cl., at 222; no representative of the Tribe was present at, or received notice of, that meeting, *id.*, at 219.

On July 17, 1985, Secretary Hodel sent a memorandum to Deputy Assistant Secretary Fritz. App. 117–118. The memorandum "suggest[ed]" that Fritz "inform the involved parties that a decision on th[e] appeal is not imminent and urge them to continue with efforts to resolve this matter in a mutually agreeable fashion." *Id.*, at 117. "Any royalty adjustment which is imposed on those parties without their concurrence," the memorandum stated, "will almost certainly be the subject of protracted and costly appeals," and "could well impair the future of the contractual relationship"

---

pleadings . . . has expired." § 2.19(a). Because more than 30 days had elapsed by June 1985, App. 12, either party would have been entitled to have the matter transferred to the Board. 25 CFR § 2.19(b) (1985). Neither Peabody nor the Tribe chose to go that route, which would have entailed a formalized (and possibly protracted) additional administrative process. See § 2.3(c) ("Appeals to the Board of Indian Appeals shall be made in the manner provided in Department Hearings and Appeals Procedures in 43 CFR Part 4, Subpart D."); 43 CFR §§ 4.310–4.317 (1985) (general rules applicable to proceedings on appeal before the Board); §§ 4.330–4.340 (special rules applicable to appeals from administrative actions of officials of the Bureau of Indian Affairs). At the conclusion of proceedings before the Board, either side could have sought reconsideration, § 4.315(a), or requested further review by the Director of the Office of Hearings and Appeals, § 4.5(b), or by the Secretary of the Interior, § 4.5(a).

between the parties. *Ibid.*[4] Secretary Hodel added, however, that the memorandum was "not intended as a determination of the merits of the arguments of the parties with respect to the issues which are subject to the appeal." *Id.,* at 118.

The Tribe was not told of the Secretary's memorandum to Fritz, but learned that " 'someone from Washington' had urged a return to the bargaining table." 46 Fed. Cl., at 223; see App. 342–344. Facing "severe economic pressure," 263 F. 3d, at 1328; App. 355–356, the Tribe resumed negotiations with Peabody in August 1985, 46 Fed. Cl., at 223.

On September 23, 1985, the parties reached a tentative agreement on a package of amendments to Lease 8580. *Ibid.*[5] They agreed to raise the royalty rate to 12½ percent of monthly gross proceeds, and to make the new rate retroactive to February 1, 1984. App. 287. The 12½ percent rate was at the time customary for leases to mine coal on federal lands and on Indian lands.[6] The amendments acknowledged

---

[4] The Deputy Assistant Secretary's draft opinion letter stated that the ruling "is based on the exercise of my discretionary authority and is final for the Department." App. 97. Had the letter issued, Peabody would not have been entitled to seek further review by the Board. See 25 CFR § 2.19(c)(2) (1985) (the Board may review decisions by the Commissioner of Indian Affairs only if the decision states that it "is based on interpretation of law"); see also *supra,* at 496 (Deputy Assistant Secretary was acting as the Commissioner of Indian Affairs). But even if the opinion letter had issued as drafted, Peabody could have asked Secretary Hodel to exercise his "authority to review any decision of any employee or employees of the Department." 43 CFR § 4.5(a)(2) (1985). The Secretary could have "render[ed] the final decision" himself, § 4.5(a)(1), or "direct[ed the Deputy Assistant Secretary] to reconsider [his] decision," § 4.5(a)(2).

[5] The parties also agreed to raise the royalty rate under another lease not in issue here, which covered coal located within a former joint use area shared by the Navajo Nation and the Hopi Tribe. 46 Fed. Cl. 217, 224 (2000). Unlike Lease 8580, that lease did not contain a provision subjecting its rate to reasonable adjustment by the Secretary. *Id.,* at 233.

[6] Twelve and one-half percent is the minimum royalty rate set by Congress for leases to mine coal on federal lands, see 30 U. S. C. § 207(a), and is also the customary rate found in most such leases issued or readjusted after 1976, see Department of Interior, Minerals Management Serv., Min-

the legitimacy of tribal taxation of coal production, but stipulated that the tax rate would be capped at eight percent. *Id.*, at 295, 299.[7]  In addition, Peabody agreed to pay the

---

erals Revenue Management, General Federal and American Indian Mineral Lease Terms (Jan. 2, 2003), http://www.mrm.mms.gov/Stats/pdfdocs/lse_term.pdf (available in Clerk of Court's case file).  The Tribe identifies a single federal coal lease with a royalty rate of 17.08 percent, see Brief for Respondent 11, but, as the Government points out, that lease was "part of an experimental leasing policy tried by the Department for a short time," Reply Brief 12, n. 7 (quoting *Peabody Coal Co.*, 93 I. B. L. A. 317, 320 (1986)).  Between 1984 and 1988, the Department of the Interior's practice was not to approve IMLA leases with royalties less than the minimum rate for federal coal, *i. e.*, 12½ percent.  See App. in No. 00–5086 (CA Fed.), p. A1872.  As late as 1996 the customary royalty rate for coal leases on Indian lands issued or readjusted after 1976 did not exceed 12½ percent.  See Department of Interior, Minerals Management Serv., Mineral Revenues 1996, Report on Receipts from Federal and Indian Leases 128 (Table 47) (Jan. 2, 2003), http://www.mrm.mms.gov/stats/pdfdocs/mrr96fin.pdf (available in Clerk of Court's case file).

The Tribe argues, in its presentation to this Court, that the 12½ percent provided in amended Lease 8580 is only a "facial royalty rate," Brief for Respondent 11, and that the actual rate is lower, see Tr. of Oral Arg. 33. That assertion is based in part on the Tribe's agreement under the amended Lease to relinquish its claim for $33 million in back taxes and $56 million in back royalties, see 46 Fed. Cl., at 224, and in part on proposed findings of fact the Tribe submitted to the Court of Federal Claims, which the Government did not specifically dispute.  See App. in No. 00–5086 (CA Fed.), pp. A2703–A2727.  The proposed findings stated that a provision in the amended Lease "signifying a non-standard method of calculating the royalty," App. 180 (Proposed Findings ¶ 314), "resulted in royalty payments lower than the minimum allowable for federal coal," *id.*, at 181 (Proposed Findings ¶ 315).  To the extent the Tribe here assails the Secretary's approval of Lease 8580 as inconsistent with the then-prevailing federal policy not to approve rates below 12½ percent, we do not pursue the point, for the Tribe failed to rely on it below.  See 46 Fed. Cl., at 233 ("[T]here is no claim by the [Tribe] that the [Secretary's] 1987 approval of Lease 8580 . . . ran afoul of th[e] [federal] policy" of not approving IMLA leases with royalty rates of less than 12½ percent.).

[7] Before this Court's decision in *Kerr-McGee Corp.* v. *Navajo Tribe*, 471 U. S. 195 (1985), it was unsettled whether the Tribe could levy taxes without the approval of the Secretary of the Interior.  The imposition of a severance tax, of course, augmented the amount payable by the lessee

Tribe $1.5 million when the amendments became effective, and $7.5 million more when Peabody began mining additional coal, as authorized by the Lease amendments. *Id.*, at 292–293. The agreement "also addressed ancillary matters such as provisions for future royalty adjustments, arbitration procedures, rights of way, the establishment of a tribal scholarship fund, and the payment by Peabody of back royalties, bonuses, and water payments." 46 Fed. Cl., at 224. "In consideration of the benefits associated with these lease amendments," the parties agreed to move jointly to vacate the Area Director's June 1984 decision, which had raised the royalty to 20 percent. App. 286.

In August 1987, the Navajo Tribal Council approved the amendments. 46 Fed. Cl., at 224. The parties signed a final agreement in November 1987, App. 309, and Secretary Hodel approved it on December 14, 1987, *id.*, at 337–339. Shortly thereafter, pursuant to the parties' stipulation, the Area Director's decision was vacated. 46 Fed. Cl., at 224.

In 1993, the Tribe brought suit against the United States in the Court of Federal Claims, alleging, *inter alia*, that the Secretary's approval of the amendments to the Lease constituted a breach of trust. The Tribe sought $600 million in damages.[8]

---

to the Tribe. See 46 Fed. Cl., at 224 (royalties and taxes combined "would . . . permit the tribe to realize as much as 20.5 percent"). But see Tr. of Oral Arg. 43–44 ("[W]e can't tax 60 percent of the coal because it goes to the Navajo [G]enerating [S]tation which has a tax waiver in the plant site lease.").

[8] The Tribe has filed a separate action against Peabody, claiming improper influence over the Government's actions with respect to the Lease. See *Navajo Nation* v. *Peabody Holding Co.*, Civ. Action No. 99–469 (D. C., June 24, 2002). The Tribe's complaint in that action alleges violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U. S. C. § 1961 *et seq.*, and related wrongdoing, *inter alia*, breach of contract, interference with fiduciary relationship, conspiracy, and fraudulent concealment. See *Navajo Nation* v. *Peabody Holding Co.*, 209 F. Supp. 2d 269, 272 (DC 2002) (ruling on pretrial motions).

The Court of Federal Claims granted summary judgment for the United States. 46 Fed. Cl. 217 (2000). In no uncertain terms, that court found that the Government owed general fiduciary duties to the Tribe, which, in its view, the Secretary had flagrantly dishonored by acting in the best interests of Peabody rather than the Tribe. Nevertheless, the court concluded that the Tribe had entirely failed to link that breach of duty to any statutory or regulatory obligation which could "be fairly interpreted as mandating compensation for the government's fiduciary wrongs." *Id.*, at 236. Accordingly, the court held that the United States was entitled to judgment as a matter of law.[9]

The Court of Appeals for the Federal Circuit reversed. 263 F. 3d 1325 (2001). The Government's liability to the Tribe, it said, turned on whether "the United States controls the Indian resources." *Id.*, at 1329. Relying on 25 U. S. C. § 399 and regulations promulgated thereunder, the Court of Appeals determined that the measure of control the Secretary exercised over the leasing of Indian lands for mineral development sufficed to warrant a money judgment against the United States for breaches of fiduciary duties connected to coal leasing. 263 F. 3d, at 1330–1332. But see *infra*, at 509. The appeals court agreed with the Federal Claims Court that the Secretary's actions regarding Peabody's administrative appeal violated the Government's fiduciary obligations to the Tribe, in that those actions "suppress[ed] and conceal[ed]" the decision of the Deputy Assistant Secretary, and "thereby favor[ed] Peabody interests to the detriment of Navajo interests." 263 F. 3d, at 1332. Based on these

---

[9] The Court of Federal Claims also rejected the Tribe's claim for breach of contract, determining that the Secretary was not a party to the Lease and that his contractual authority to adjust the Lease-specified royalty rate carried with it no obligation to do so. 46 Fed. Cl., at 234–236. The Tribe did not appeal that ruling.

determinations, the Court of Appeals remanded for further proceedings, including a determination of damages. *Id.*, at 1333.

Judge Schall concurred in part and dissented in part. *Id.*, at 1333–1341. It was not enough, he maintained, for the Tribe to show a violation of a general fiduciary relationship stemming from federal involvement in a particular area of Indian affairs. Rather, a Tribe "must show the breach of a specific fiduciary obligation that falls within the contours of the statutes and regulations that create the general fiduciary relationship at issue." *Id.*, at 1341. In his view, "the only government action in this case that implicated a specific fiduciary responsibility" was the Secretary's 1987 approval of the Lease amendments. *Id.*, at 1339. The Secretary had been deficient, Judge Schall concluded, in approving the amendments without first conducting an independent economic analysis of the amended agreement. *Id.*, at 1339–1341.

The Court of Appeals denied rehearing. We granted certiorari, 535 U. S. 1111 (2002), and now reverse.

## II

### A

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *Mitchell II*, 463 U. S., at 212. The Tribe asserts federal subject-matter jurisdiction under 28 U. S. C. § 1505, known as the Indian Tucker Act. That Act provides:

> "The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would

be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group."[10]

"If a claim falls within the terms of the [Indian] Tucker Act, the United States has presumptively consented to suit." *Mitchell II*, 463 U. S., at 216.

Although the Indian Tucker Act confers jurisdiction upon the Court of Federal Claims, it is not itself a source of substantive rights. *Ibid.;* see *Mitchell I*, 445 U. S., at 538. To state a litigable claim, a tribal plaintiff must invoke a rights-creating source of substantive law that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II*, 463 U. S., at 218. Because "[t]he [Indian] Tucker Act itself provides the necessary consent" to suit, *ibid.*, however, the rights-creating statute or regulation need not contain "a second waiver of sovereign immunity," *id.*, at 218–219.

## B

*Mitchell I* and *Mitchell II* are the pathmarking precedents on the question whether a statute or regulation (or combination thereof) "can fairly be interpreted as mandating compensation by the Federal Government." *Mitchell II*, 463 U. S., at 218.

In *Mitchell I*, we considered whether the Indian General Allotment Act of 1887 (GAA), 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.* (1976 ed.) (§§ 331–333 repealed 2000), authorized an award of money damages against the United

---

[10] The reference to claims "which otherwise would be cognizable in the Court of Federal Claims" incorporates the Tucker Act, 28 U. S. C. § 1491. See *Mitchell II*, 463 U. S., at 212, n. 8; *Mitchell I*, 445 U. S. 535, 539 (1980). The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U. S. C. § 1491(a)(1).

States for alleged mismanagement of forests located on lands allotted to tribal members. The GAA authorized the President of the United States to allot agricultural or grazing land to individual tribal members residing on a reservation, § 331, and provided that "the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit of the Indian to whom such allotment shall have been made," § 348.

We held that the GAA did not create private rights enforceable in a suit for money damages under the Indian Tucker Act. After examining the GAA's language, history, and purpose, we concluded that it "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Mitchell I*, 445 U. S., at 542. In particular, we stressed that §§ 1 and 2 of the GAA removed a standard element of a trust relationship by making "the Indian allottee, and not a representative of the United States, . . . responsible for using the land for agricultural or grazing purposes." *Id.*, at 542–543; see *id.*, at 543 ("Under this scheme, . . . the allottee, and not the United States, was to manage the land."). We also determined that Congress decided to have "the United States 'hold the land . . . in trust' not because it wished the Government to control use of the land . . . , but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation." *Id.*, at 544. Because "the Act [did] not . . . authoriz[e], much less requir[e], the Government to manage timber resources for the benefit of Indian allottees," *id.*, at 545, we held that the GAA established no right to recover money damages for mismanagement of such resources. We left open, however, the possibility that other sources of law might support the plaintiffs' claims for damages. *Id.*, at 546, and n. 7.

In *Mitchell II*, we held that a network of other statutes and regulations did impose judicially enforceable fiduciary

duties upon the United States in its management of forested allotted lands. "In contrast to the bare trust created by the [GAA]," we observed, "the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." 463 U. S., at 224.

As to managing the forests and selling timber, we noted, Congress instructed the Secretary to be mindful of "the needs and best interests of the Indian owner and his heirs," 25 U. S. C. § 406(a), and specifically to take into account:

> "(1) the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs, (2) the highest and best use of the land, including the advisability and practicality of devoting it to other uses for the benefit of the owner and his heirs, and (3) the present and future financial needs of the owner and his heirs." *Ibid.*

Proceeds from timber sales were to be paid to landowners "or disposed of for their benefit." *Ibid.* Congress' prescriptions, Interior Department regulations, and "daily supervision over the harvesting and management of tribal timber" by the Department's Bureau of Indian Affairs, we emphasized, combined to place under federal control "[v]irtually every stage of the process." *Mitchell II*, 463 U. S., at 222 (internal quotation marks omitted); see *id.*, at 222–224 (describing comprehensive timber management statutes and regulations promulgated thereunder).

Having determined that the statutes and regulations "establish[ed] fiduciary obligations of the Government in the management and operation of Indian lands and resources," we concluded that the relevant legislative and executive prescriptions could "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Id.*, at 226. A damages remedy, we explained, would "furthe[r] the purposes of the statutes and regulations, which

clearly require that the Secretary manage Indian resources so as to generate proceeds for the Indians." *Id.*, at 226–227.

To state a claim cognizable under the Indian Tucker Act, *Mitchell I* and *Mitchell II* thus instruct, a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. See 463 U. S., at 216–217, 219. If that threshold is passed, the court must then determine whether the relevant source of substantive law "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Id.*, at 219. Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforc[e]" the conclusion that the relevant statute or regulation imposes fiduciary duties, *id.*, at 225, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred. See *id.*, at 217, n. 16 ("[T]he substantive source of law may grant the claimant a right to recover damages either expressly or by implication." (internal quotation marks and citation omitted)).

### C

We now consider whether the IMLA and its implementing regulations can fairly be interpreted as mandating compensation for the Government's alleged breach of trust in this case. We conclude that they cannot.

### 1

The Tribe's principal contention is that the IMLA's statutory and regulatory scheme, viewed in its entirety, attaches

fiduciary duties to each Government function under that scheme, and that the Secretary acted in contravention of those duties by approving the 12½ percent royalty contained in the amended Lease. See, *e. g.*, Brief for Respondent 20, 30–38. We read the IMLA differently. As we see it, the statute and regulations at issue do not provide the requisite "substantive law" that "mandat[es] compensation by the Federal Government." *Mitchell II*, 463 U. S., at 218.

The IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that *Mitchell II* found adequate to support a claim for money damages.[11] The IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective, 25 U. S. C. § 396a, and authorizes the Secretary generally to promulgate regulations governing mining operations, § 396d. Yet the dissent concludes that the IMLA imposes "one or more specific statutory obligations, as in *Mitchell II*, at the level of fiduciary duty whose breach is compensable in damages." *Post*, at 521. The endeavor to align this case with *Mitchell II* rather than *Mitchell I*, however valiant, falls short of the mark. Unlike the "elaborate" provisions before the Court in *Mitchell II*, 463 U. S., at 225, the IMLA and its regulations do not "give the Federal Government full responsibility to manage Indian resources . . . for the benefit of the Indians," *id.*, at 224. The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure "the needs and best interests of the

---

[11] We rule only on the Government's role in the coal leasing process under the IMLA. As earlier recounted, see *supra*, at 494, both the IMLA and its implementing regulations address oil and gas leases in considerably more detail than coal leases. Whether the Secretary has fiduciary or other obligations, enforceable in an action for money damages, with respect to oil and gas leases is not before us.

Indian owner and his heirs." *Ibid.* (internal quotation marks omitted) (quoting 25 U. S. C. § 406(a)).[12]

Instead, the Secretary's involvement in coal leasing under the IMLA more closely resembles the role provided for the Government by the GAA regarding allotted forest lands. See *Mitchell I,* 445 U. S., at 540–544. Although the GAA required the Government to hold allotted land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made," *id.,* at 541 (quoting 25 U. S. C. § 348), that Act did not "authoriz[e], much less requir[e], the Government to manage timber resources for the benefit of Indian allottees," *Mitchell I,* 445 U. S., at 545. Similarly here, the IMLA and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the "limited trust relationship," *id.,* at 542, existing under the GAA; no provision of the IMLA or its regulations contains *any* trust language with respect to coal leasing.

Moreover, as in *Mitchell I,* imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes. The GAA was designed so that "the allottee, and not the United States, . . . [would] manage the land." *Id.,* at 543. Imposing upon the Government a fiduciary duty to oversee the management of allotted lands would not have served that purpose. So too here. The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties. See *supra,* at 494. As the Court of Federal Claims recognized, "[t]he ideal of Indian self-determination is directly at odds with Secretarial control over leasing." 46 Fed. Cl., at 230.

---

[12] Both the Tribe and the dissent refer to portions of 25 CFR pt. 211 that require administrative decisions affecting tribal mineral interests to be made in the best interests of the tribal mineral owner. See Brief for Respondent 27, 31; *post,* at 516–517. We note, however, that the referenced regulatory provisions were adopted more than a decade after the events at issue in this case. See 61 Fed. Reg. 35653 (1996).

2

The Tribe nevertheless argues that the actions of the Secretary targeted in this case violated discrete statutory and regulatory provisions whose breach is redressable in an action for damages. In this regard, the Tribe relies extensively on 25 U. S. C. § 399, see, *e. g.*, Brief for Respondent 22–23, 30–31, upon which the Court of Appeals placed considerable weight as well, see 263 F. 3d, at 1330–1331; *supra*, at 501. That provision, however, is not part of the IMLA and does not govern Lease 8580. Enacted almost 20 years before the IMLA, § 399 authorizes *the Secretary* to lease certain unallotted Indian lands for mining purposes on terms she sets, and does not provide for input from the Tribes concerned. See *supra*, at 494. In exercising that authority, the Secretary is authorized to "perform any and all acts . . . as may be necessary and proper for the protection of the interests of the Indians and for the purpose of carrying the provisions of this section into full force and effect." § 399. But that provision describes the Secretary's *leasing* authority under § 399; it does not bear on the Secretary's more limited *approval* role under the IMLA.

Similarly unavailing is the Tribe's reliance on the Indian Mineral Development Act of 1982 (IMDA), 25 U. S. C. § 2101 *et seq.* See Brief for Respondent 23–24, 30. The IMDA governs the Secretary's approval of agreements for the development of certain Indian mineral resources through exploration and like activities. It does not establish standards governing the Secretary's approval of mining *leases* negotiated by a Tribe and a third party. The Lease in this case, in short, falls outside the IMDA's domain. See Reply Brief 12–13.

Citing 25 U. S. C. § 396a, the IMLA's general prescription, see *supra*, at 493, the Tribe next asserts that the Secretary violated his "duty to review and approve any proposed coal lease with care to promote IMLA's basic purpose and the [Tribe's] best interests." Brief for Respondent 39. To sup-

port that assertion, the Tribe points to various Government reports identifying 20 percent as the appropriate royalty, see *id.*, at 5–7, 15, and to the Secretary's decision, made after receiving *ex parte* communications from Peabody, to withhold departmental action, see *id.*, at 9–10, 15.

In the circumstances presented, the Tribe maintains, the Secretary's eventual approval of the 12½ percent royalty violated his duties under § 396a in two ways. First, the Secretary's approval was "improvident," Tr. of Oral Arg. 48, because it allowed the Tribe's coal "to be conveyed for what [the Secretary] knew to be about half of its value," *id.*, at 49. Second, Secretary Hodel's intervention into the Lease adjustment process "skewed the bargaining" by depriving the Tribe of the 20 percent rate, rendering the Secretary's subsequent approval of the 12½ percent rate "unfair." *Id.*, at 50.

The Tribe's vigorously pressed arguments headlining § 396a fare no better than its arguments tied to § 399 and the IMDA; the § 396a arguments fail, for they assume substantive prescriptions not found in that provision.[13] As to the "improviden[ce]" of the Secretary's approval, the Tribe can point to no guides or standards circumscribing the Secretary's affirmation of coal mining leases negotiated between a Tribe and a private lessee. Regulations under the IMLA in effect in 1987 established a minimum royalty of ten cents per ton. See 25 CFR § 211.15(c) (1985). But the royalty contained in Lease 8580 well exceeded that regulatory floor.

---

[13] The Lease itself authorized the Secretary to make "reasonable [royalty] adjustment[s]." App. 194. As noted above, however, see *supra*, at 501, n. 9, the Court of Federal Claims determined, and the Tribe does not here dispute, that the Secretary is not a signatory to the Lease and that the Lease is not contractually binding on him. See 46 Fed. Cl., at 234–236. We thus perceive no basis for infusing the Secretary's *approval* function under § 396a with substantive standards that might be derived from his *adjustment* authority under the Lease, and certainly no basis for concluding that an alleged "breach" of those standards is cognizable in an action for money damages under the Indian Tucker Act.

See *supra*, at 495–496.[14] At the time the Secretary approved the amended Lease, it bears repetition, 12½ percent was the rate the United States itself customarily received from leases to mine coal on federal lands. Similarly, the customary rate for coal leases on Indian lands issued or readjusted after 1976 did not exceed 12½ percent. See *supra*, at 498–499, n. 6.[15]

In sum, neither the IMLA nor any of its regulations establishes anything more than a bare minimum royalty. Hence, there is no textual basis for concluding that the Secretary's approval function includes a duty, enforceable in an action for money damages, to ensure a higher rate of return for the Tribe concerned. Similarly, no pertinent statutory or regulatory provision requires the Secretary, on pain of damages, to conduct an independent "economic analysis" of the reasonableness of the royalty to which a Tribe and third party have agreed. 263 F. 3d, at 1340 (concurring opinion below, finding such a duty).[16]

---

[14] Because the Tribe does not contend that the amended Lease failed to meet the minimum royalty under the regulations then in effect, we need not decide whether the Secretary's approval of such a lease would trigger money damages. See Reply Brief 15 ("The Court may . . . assume for present purposes that a failure by the Secretary to ensure, prior to approving a proposed lease, that its terms (or amendments) comply with the regulation specifying the minimum royalty rate to which the parties may agree would support a claim under the Tucker Act.").

[15] Under 30 U. S. C. § 207(a), that customary rate was also a statutorily defined minimum for federal coal leases. See *supra*, at 498–499, n. 6. Section 207(a), which applies to federal lands in general, did not apply to leases of Indian lands until 1996, when 25 CFR § 211.43(a)(2) was promulgated. See Reply Brief 13–14. At the pre-1996 times relevant here, the sole specific provision governing Tribe-private lessee coal leases was the ten cents per ton minimum prescribed in 25 CFR § 211.15(c) (1985).

[16] Citing language from the legislative history, the dissent stresses that the IMLA aimed in part to "give the Indians the greatest return from their property," *post*, at 516 (quoting S. Rep. No. 985, 75th Cong., 1st Sess., 2 (1937)), and suggests that the Secretary's approval role encompasses an enforceable duty to further that objective, see *post*, at 517. We have cautioned against according "talismanic effect" to the Senate Report's "reference to 'the greatest return from [Indian] property,'" and have observed

The Tribe's second argument under § 396a concentrates on the "skew[ing]" effect of Secretary Hodel's 1985 intervention, *i. e.*, his direction to Deputy Assistant Secretary Fritz to withhold action on Peabody's appeal from the Area Director's decision setting a royalty rate of 20 percent. Tr. of Oral Arg. 50; see *supra*, at 497–498. The Secretary's actions, both in intervening in the administrative appeal process, and in approving the amended Lease, the Tribe urges, were not based upon an assessment of the merits of the royalty issue; instead, the Tribe maintains, they were attributable entirely to the undue influence Peabody exerted through *ex parte* communications with the Secretary. See Brief for Respondent 40–42. Underscoring that the Tribe had no knowledge of those communications or of Secretary Hodel's direction to Fritz, see *supra*, at 498, the Tribe asserts that its bargaining position was seriously compromised when it resumed negotiations with Peabody in 1985. See, *e. g.*, Tr. of

that it "overstates" Congress' aim to attribute to the Legislature a purpose "to guarantee Indian tribes the maximum profit available." *Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S. 163, 179 (1989). Beyond doubt, the IMLA was designed "to provide Indian tribes with a profitable source of revenue." *Ibid.,* quoted *supra,* at 493. But Congress had as a concrete objective in that regard the removal of certain impediments that had applied particularly to mineral leases on Indian land. See *Cotton,* 490 U. S., at 179 ("Congress was . . . concerned . . . with matters such as the unavailability of extralateral mineral rights on Indian land."); S. Rep. No. 985, at 2 ("[O]n the public domain the discoverer of a mineral deposit gets extralateral rights and can follow the ore beyond the side lines indefinitely, while on the Indian lands under the act of June 30, 1919, he is limited to the confines of the survey markers not to exceed 600 feet by 1,500 feet in any one claim. The draft of the bill herewith would permit the obtaining of sufficient acreage to remove the necessity for extralateral rights with all its attending controversies."); H. R. Rep. No. 1872, 75th Cong., 3d Sess., 2 (1938) (same). That impediment-removing objective is discrete from the Secretary's lease approval role under the IMLA. Again, we find no solid basis in the IMLA, its regulations, or lofty statements in legislative history for a legally enforceable command that the Secretary disapprove Indian coal leases unless they survive "an independent market study," *post,* at 519, or satisfy some other extratextual criterion of tribal profitability.

Oral Arg. 50–52. The Secretary's ultimate approval of the 12½ percent royalty, the Tribe concludes, was thus an outcome fundamentally unfair to the Tribe.

Here again, as the Court of Federal Claims ultimately determined, see *supra,* at 501, the Tribe's assertions are not grounded in a specific statutory or regulatory provision that can fairly be interpreted as mandating money damages. Nothing in § 396a, the IMLA's basic provision, or in the IMLA's implementing regulations proscribed the *ex parte* communications in this case, which occurred during an administrative appeal process largely unconstrained by formal requirements. See 25 CFR § 2.20 (1985) (Commissioner may rely on "any information available to [him] . . . whether formally part of the record or not."); *supra,* at 496–497, n. 3. Either party could have effected a transfer of Peabody's appeal to the Board. See 25 CFR § 2.19(b) (1985); *supra,* at 496–497, n. 3. Exercise of that option would have triggered review of a more formal character, in which *ex parte* communications would have been prohibited. See 43 CFR § 4.27(b) (1985). But the Tribe did not elect to transfer the matter to the Board, and the regulatory proscription on *ex parte* contacts applicable in Board proceedings thus did not govern.

We note, moreover, that even if Deputy Assistant Secretary Fritz had rendered an opinion affirming the 20 percent royalty approved by the Area Director, it would have been open to the Secretary to set aside or modify his subordinate's decision. See *supra,* at 498, n. 4. As head of the Department of the Interior, the Secretary had "authority to review any decision of any employee or employees of the Department." 43 CFR § 4.5(a)(2) (1985); cf. *Michigan Citizens for Independent Press* v. *Thornburgh,* 868 F. 2d 1285 (CADC) (upholding Attorney General's approval, over the contrary conclusions of an administrative law judge and the Justice Department's Antitrust Division, of a joint operating agreement under the Newspaper Preservation Act), aff'd by an equally divided Court, 493 U. S. 38 (1989) *(per curiam).* Ac-

cordingly, rejection of Peabody's appeal by the Deputy Assistant Secretary would not necessarily have yielded a higher royalty for the Tribe.

\* \* \*

However one might appraise the Secretary's intervention in this case, we have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act. The judgment of the United States Court of Appeals for the Federal Circuit is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, dissenting.

The issue in this case is whether the Indian Mineral Leasing Act (IMLA) and its regulations imply a specific duty on the Secretary of the Interior's part, with a cause of action for damages in case of breach. The Court and I recognize that if IMLA indicates that a fiduciary duty was intended, it need not provide a damages remedy explicitly; once a statutory or regulatory provision is found to create a specific fiduciary obligation, the right to damages can be inferred from general trust principles, and amenability to suit under the Indian Tucker Act. See *United States* v. *White Mountain Apache Tribe, ante,* at 472–473; *United States* v. *Mitchell,* 463 U. S. 206, 226 (1983) *(Mitchell II).* I part from the majority because I take the Secretary's obligation to approve mineral leases under 25 U. S. C. § 396a as raising a substantial fiduciary obligation to the Navajo Nation (Tribe), which has pleaded and shown enough to survive the Government's motion for summary judgment. I would affirm the judgment of the Federal Circuit.

IMLA requires the Secretary's approval for the effectiveness of any lease negotiated by the Tribe with a third party. §396a; see also 25 CFR §211.2 (1985). The Court accepts the Government's position, see Brief for United States 38, that the IMLA approval responsibility places no substantive obligation on the Secretary, save for a minimal duty to withhold assent from leases calling for less than the minimum royalty rate set by IMLA regulations, whatever that may be. *Ante*, at 511. Since that rate is merely a general standard, which may be a bargain rate when applied to extractable material of high quality, the obligation to demand it may not amount to much. The legislative history and purposes of IMLA, however, illuminated by the Secretary's historical role in reviewing conveyances of Indian lands, point to a fiduciary responsibility to make a more ambitious assessment of the best interest of the Tribe before signing off.

The protective purpose of the Secretary's approval power has appeared in our discussions of other statutes governing Indian lands over the years. In *Tiger* v. *Western Investment Co.*, 221 U. S. 286 (1911), for example, we upheld the constitutionality of the Act of Apr. 26, 1906, ch. 1876, §22, 34 Stat. 145, which made alienation of certain allotted lands by citizen Indians "subject to the approval of the Secretary of the Interior." Although allotment and conferral of citizenship had given tribal members greater responsibility for their own interest, see, *e. g., Choteau* v. *Burnet*, 283 U. S. 691, 694 (1931), we nevertheless understood that the requirement of prior approval was supposed to satisfy the National Government's trust responsibility to the Indians, *Tiger, supra*, at 310–311; accord, *Sunderland* v. *United States*, 266 U. S. 226, 233 (1924) (restraints on alienation of Indian property are enacted "in fulfillment of [Congress's] duty to protect the Indians"). Shortly after *Tiger*, in *Anicker* v. *Gunsburg*, 246 U. S. 110 (1918), we held that the Secretary's authority to approve leases of allotted lands under the Act of May 27,

1908, ch. 199, § 2, 35 Stat. 312, was "unquestionably . . . given to him for the protection of Indians against their own improvidence and the designs of those who would obtain their property for inadequate compensation." 246 U. S., at 119. The Secretary's approval power was understood to be a significant component of the Government's general trust responsibility. See Clinton, Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government, 33 Stan. L. Rev. 979, 1002–1003 (1981); Chambers & Price, Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands, 26 Stan. L. Rev. 1061, 1061–1068 (1974).

Congress's decision in IMLA to give the Secretary an approval authority is well understood in terms of this background, for in the enactment of IMLA, Congress devised a scheme of divided responsibility reminiscent of the old allotment legislation. While it changed the prior law by transferring negotiating authority from the Government to the tribes, it hedged that augmentation of tribal authority in leaving the Secretary with certain powers of oversight, including the authority to approve or reject leases once the tribes negotiated them. 25 U. S. C. §§ 396a–g. The Secretary's signature was the final step in a scheme of "uniform leasing procedures designed to protect the Indians," *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 764 (1985), and imposed out of a concern that existing laws were not "adequate to give the Indians the greatest return from their property," S. Rep. No. 985, 75th Cong., 1st Sess., 2 (1937); H. R. Rep. No. 1872, 75th Cong., 3d Sess., 2 (1938). The "basic purpose" of the Secretary's powers under IMLA is thus to "maximize tribal revenues from reservation lands." *Kerr-McGee Corp.* v. *Navajo Tribe*, 471 U. S. 195, 200 (1985); see *Blackfeet Tribe, supra,* at 767, n. 5. Consistent with this aim, the Secretary's own IMLA regulations (now in effect) provide that administrative actions, including lease approvals, are to be taken "[i]n the best interest of the Indian mineral owner."

25 CFR § 211.3 (2002); see also § 211.1 (stating that the over-arching purpose of IMLA regulations is to ensure that Indians' mineral resources "will be developed in a manner that maximizes their best economic interests").[1] Thus, viewed in light of IMLA's legislative history and the general trust relationship between the United States and the Indians, see *Mitchell II*, 463 U. S., at 224–225, § 396a supports the existence of a fiduciary responsibility to review mineral leases for substance to safeguard the Indians' interest.[2]

I do not mean to suggest that devising a specific standard of responsibility is any simple matter, for we cannot ignore the tension between IMLA's two objectives. If we thought solely in terms of the aim to ensure that negotiated leases "maximize tribal revenues," *Kerr-McGee, supra,* at 200, we would ignore the object of IMLA to provide greater tribal responsibility, against which the Secretary's oversight is act-

---

[1] In addition, the Interior Department at all times relevant to this case had in place an internal policy providing that mineral leases would be approved only if "the terms and conditions of the lease are in the best interest of the Indian landowner." App. 2, 133–134.

[2] The majority seeks to distinguish *Mitchell II*, saying that the timber management statutes at issue there gave the Secretary a "comprehensive managerial role" and stated explicitly that timber sales had to be made in consideration of "'the needs and best interests of the Indian owner and his heirs.'" *Ante,* at 507–508. The comprehensiveness of the Secretary's role just described is what made *Mitchell II* an easy case. *Mitchell II* did not say, however, that fiduciary duties can only be found where the Government has "elaborate control." 463 U. S., at 225. Nor does *Mitchell II*'s reference to the statute's explicit "best interests" language foreclose the use of standard interpretive tools like legislative history to determine whether a statute establishes a fiduciary duty.

The majority proceeds to discount IMLA's legislative history, suggesting that Congress's concern for Indian revenues was limited to the elimination of certain constraints peculiar to Indian mineral leases. *Ante,* at 511–512, n. 16. But the cited IMLA legislative reports do not indicate that Congress's aims were restricted to curing these specific deficiencies of prior law, and they do nothing to detract from the consistent recognition in our precedents that IMLA's leasing procedures were designed to protect Indian interests in mineral resources.

ing as a hedge.  See Royster, Mineral Development in Indian Country: The Evolution of Tribal Control Over Mineral Resources, 29 Tulsa L. Rev. 541, 558–580 (1994) (noting the twin aims of IMLA).  The more stringent the substantive obligation of the Secretary, the less the scope of tribal responsibility.  The Court, however, errs in the opposite direction, giving overriding weight to the interest of tribal autonomy to the point of concluding that the Secretary's approval obligation cannot be an onerous one, *ante*, at 508, thus losing sight of the mixture of congressional objectives.  The standard of responsibility simply cannot give the whole hog to the one congressional policy or the other.

While this is not the case to essay any ultimate formulation of a balanced standard, even a reticent formulation of the fiduciary obligation would require the Secretary to withhold approval if he had good reason to doubt that the negotiated rate was within the range of reasonable market rates for the coal in question, or if he had reason to know that the Tribe had been placed under an unfair disadvantage at the negotiating table by his very own acts.  See Restatement (Second) of Trusts §§ 170, 173, 174, 176 (1957).  And those modest standards are enough to keep the present suit in court, for the Tribe has pleaded a breach of trust in each respect and has submitted evidence to get past summary judgment on either alternative.

The record discloses serious indications that the 12½ percent royalty rate in the lease amendments was substantially less than fair market value for the Tribe's high quality coal. In the course of deciding that 20 percent would be a reasonable adjustment under the terms of the lease, the Area Director of the Board of Indian Affairs (BIA) considered several independent economic studies, each one of them recommending rates around 20 percent, and one specifically rejecting 12½ percent as "inadequate."  App. 6–7 (internal

quotation marks omitted).[3] These conclusions were confirmed by the expert from the BIA's Energy and Mineral Division, in a supplemental report submitted after Peabody appealed the Area Director's decision. That report not only endorsed the 20 percent rate, but expressly found that the royalty rate "should be much higher than the 12.5% that the Federal Government receives for surface-mined coal" because the Navajo coal is "extremely valuable." *Id.*, at 22. No federal study ever recommended a royalty rate under 20 percent, and yet the Secretary approved a rate little more than half that. *Id.*, at 134. When this case was before the Federal Circuit, Judge Schall took the sensible position that the Secretary was obligated to obtain an independent market study to assess the rate in these circumstances, see 263 F. 3d 1325, 1340 (2001) (opinion concurring in part and dissenting in part), and the record as it stands shows the Secretary to be clearly open to the claim of fiduciary breach for approving the rate on the information he is said to have had. Of course I recognize that the Secretary's obligation is to approve leases, not royalty rates in isolation, but an allegation that he approved an otherwise unjustified rate apparently well below market for the particular resource deposit certainly raises a claim of breach.

---

[3] The United States Bureau of Mines recommended an adjusted royalty rate of 20 percent, while the BIA's Division of Energy and Mineral Resources recommended 24.44 percent in a separate report. Several private studies also endorsed rates in the 20 percent range: one, conducted by the Council of Energy Resource Tribes, concluded that the rate should be between 15 and 20 percent, and another, prepared by a private management consultant firm at the request of the Navajo, advocated a rate of between 17.08 and 22.77 percent. The only report with a significantly lower rate was the report submitted by Peabody, which recommended a rate of 5.57 to 7.16 percent. This figure was based not on current fair value but rather on what rate would "restore the benefits that were originally contemplated when the 1964 lease was signed by both parties." App. 16–18.

What is more, the Tribe has made a powerful showing that the Secretary knew perfectly well how his own intervention on behalf of Peabody had derailed the lease adjustment proceeding that would in all probability have yielded the 20 percent rate. After his *ex parte* meeting with Peabody's representatives, the Secretary put his name on the memorandum, drafted by Peabody, directing Deputy Assistant Secretary Fritz to withhold his decision affirming the 20 percent rate; directing him to mislead the Tribe by telling it that no decision on the merits of the adjustment was imminent, when in fact the affirmance had been prepared for Fritz's signature; and directing him to encourage the Tribe to shift its attention from the Area Director's appealed award of 20 percent and return to the negotiating table, where 20 percent was never even a possibility. App. 117–118. The purpose and predictable effect of these actions was to induce the Tribe to take a deep discount in the royalty rate in the face of what the Tribe feared would otherwise be prolonged revenue loss and uncertainty. The point of this evidence is not that the Secretary violated some rule of procedure for administrative appeals, *ante*, at 512–513, or some statutory duty regarding royalty adjustments under the terms of the earlier lease. What these facts support is the Tribe's claim that the Secretary defaulted on his fiduciary responsibility to withhold approval of an inadequate lease accepted by the Tribe while under a disadvantage the Secretary himself had intentionally imposed.[4]

---

[4] The possibility that the Secretary could have set aside Fritz's rejection of Peabody's appeal does not, despite the Court's suggestion, *ante*, at 513–514, defeat the Tribe's claim under § 396a. As an initial matter, whatever formal authority the Secretary may have had, nothing cited by the parties suggests that the Secretary was considering such action, which would have painted him plainly as catering to Peabody. Hence the cautious qualification in the memorandum to Fritz, emphasizing that his intervention was "not intended as a determination of the merits" of the 20 percent rate adjustment. App. 118. Given that the federal economic surveys unanimously endorsed 20 percent, it is unclear what basis the Secretary

All of this is not to say that the Tribe would end up with a recovery at the end of the day. Disputed facts have not been tried; the negotiations affected not only the 1964 lease that was subject to adjustment on demand, but also other leases apparently not subject to the same option for the Tribe's benefit; and the renegotiated terms affected lease provisions other than royalties (including tax terms). For all we can say now, the net of all these changes may have been an overall bargain in the Tribe's interest, despite the smaller royalty figure in the lease as approved. But the only issue here is whether the Tribe's claims address one or more specific statutory obligations, as in *Mitchell II*, at the level of fiduciary duty whose breach is compensable in damages. The Tribe has pleaded such duty, the record shows that the Tribe has a case to try, and I respectfully dissent.

---

would have had to reject the rate on the merits. More importantly, the gravamen of the Tribe's claim is not that it is entitled to the 20 percent rate adjustment under the lease. Rather, it is that the Secretary's actions in deceiving the Tribe about the status of Peabody's appeal skewed the subsequent bargaining process, and the resulting royalty rate, in Peabody's favor. On that issue, whether the Secretary might have ultimately favored Peabody's appeal, while perhaps a subject of relevant evidence, is not dispositive.