*Patrick BENALLY, Sr.*
Petitioner

*vs.*

*Berlita BENALLY*
Respondent

In the Family Court of the Navajo Nation
Judicial District of Kayenta Arizona

No. KY-FC-583-02 CV

No. KY-FC-038-03 CV

December 29, 2003

## ORDER

This matter comes before the court upon a Motion for summary judgment by Ms.

Berlita Benally,[1] Respondent. The Court heard oral arguments on March 11, 2003 between Lawrence Ruzow, Counsel for Petitioner, and Dennis Glanzer, Counsel for Respondent.[2] Having reviewed the motion, the counter-motion, the case file, other case files pertinent to this case, and being advised in the premises, the court hereby issues its Order.

## FINDINGS

1. This court has personal and subject matter jurisdiction over the parties and matter herein.

2. This matter is a continuation of previous actions filed in the Family Court and in the Peacemaking Division. On December 15, 1999, Ms. Berlita Benally filed a Petition for domestic abuse protection order against Mr. Patrick Benally. On February 15, 2000, the Honorable Leroy Bedonie granted a temporary protection order, issued a garnishment order to Mr. Patrick Benally's employer to collect child support, and transferred the case to the Peacemaking Division for the parties to work out the issues. On April 10, 2000, Peacemaker Elwood Sageney facilitated a Peacemaking session in which the parties agreed to dismiss the domestic abuse court case with the following conditions:

   a. Patrick Benally will pay child support,

   b. Patrick Benally will have open visitation with the children,

   c. Berlita Benally will have custody of the four children, and

   d. Patrick Benally will build a house for his children.

The following day, on April 11, 2000, the court issued an order incorporating the Peacemaking agreement. A year later, Ms. Berlita Benally requested the court to clarify the child support provision in the order. The court issued an Amended Order on June 5, 2001.

3. Immediately after the court issued the Amended Order, Mr. Patrick Benally requested on June 11, 2001 for a Peacemaking session to address the more permanent issue of divorce. (The previous proceedings only addressed domestic abuse and not divorce. Mr. Benally's petition refers to divorce.) Mr. Benally included in his petition the following issues to be addressed by Peacemaking: Restoring Ms. Benally's maiden name, visitation, and child support. On August 29, 2001, Peacemaker Analita Osif facilitated a Peacemaking session pursuant to Mr. Benally's request. The Peacemaking agreement documenting the Peacemaking session contains the following provisions:

   a. The parties' divorce by stipulation,

   b. Patrick Benally will pay child support,

---

1 For purposes of being consistent with the case caption, the court will refer to Berlita Chief Benally as Berlita Benally.

2 This Order will treat Mr. Patrick Benally as the petitioner and Ms. Berlita Benally as the respondent according the first of the two consolidated cases.

    c. Half of the cost of the JUA House will go to Berlita Benally and children,

    d. Patrick Benally's employment will pay medical insurance,

    f, Patrick Benally will have open visitation with the children,

    g. Berlita Benally will have custody of the four children,

    h. Berlita Benally's maiden name will be restored, and

    i. The child's name will be changed.

The parties did not attempt to incorporate the Peacemaking agreement into an order.

4. Upon attempts to divide the JUA House equally pursuant to the Peacemaking agreement, the Peacemaking Division received a letter from the U.S. Navajo And Hopi Indian Relocation Office on October 3, 2001. The federal office indicated that it does not have any comment regarding the Peacemaking agreement, however, that it needs a legal divorce or reconciliation to proceed with relocation.

5. One year later, on August 15, 2002, Mr. Patrick Benally filed a Petition for divorce with the Family Court. The petition identified divorce, custody, visitation, child support, and the JUA House as issues to be resolved. On October 15, 2002, Ms. Berlita Benally filed a Motion to dismiss the case for lack of jurisdiction along with other requests. Ms. Benally argued that the divorce has already been addressed by the Peacemaking agreement dated August 29, 2001. Mr. Patrick Benally responded to the motion to dismiss arguing that the Peacemaking agreement was not incorporated into a Court order and that the Peacemaking agreement, alone, cannot be enforced. Mr. Benally further argued that the Peacemaking agreement does not have the force of law and cannot change the legal status of federal benefits. Ms. Benally replied contending that the Peacemaking agreement is valid even without it being incorporated into a court order. The court heard oral arguments on the Motion to dismiss the case on December 5, 2002. The court denied Ms. Benally's motion to dismiss the case.

6. Ms. Berlita Benally responded to the original petition for divorce on January 21, 2003. Ms. Benally contended that the Peacemaking agreement dated August 29, 2001 precludes the court from hearing the issues of divorce, custody, visitation, child support, and the JUA House by virtue of the *res judicata* doctrine. Ms. Benally stated that the Peacemaking Division has already resolved these issues as evidenced by the Peacemaking agreement dated August 29, 2001.

7. On November 15, 2002, Ms. Berlita Benally filed a Petition for an order to show cause against Mr. Patrick Benally for his failure to pay child support in violation of the court's amended Order dated June 5, 2001, and in violation of the Peacemaking agreement dated August 29, 2001. The Court docketed

Ms. Benally's petition under a new docket number separate from Mr. Patrick Benally's Petition for divorce. Later, on January 28, 2003, the Court consolidated this case (the order to show cause case) with the divorce action.

8. On January 13, 2003, Mr. Patrick Benally filed a motion to join the State of Utah, and Support Kids, Inc, into the Order to show cause proceeding. Mr. Benally argued that Berlita Benally assigned her right to child support to Utah and Support Kids, Inc. and therefore these entities should be joined.

9. On February 6, 2003, Mr. Patrick Benally filed for an order compelling the Navajo Nation Division of Social Services to conduct a home study of Ms. Berlita Benally's home to help determine the issue of custody. Mr. Benally contended that the August 29, 2001 Peacemaking session did not address custody. Ms. Berlita Benally responded on March 3, 2003 to the Motion for homestudy by arguing that a change in circumstances is required to modify the Amended Order dated June 5, 2001 (that gives custody of the children to Ms. Benally) and no such change in circumstances has been shown.

10. On February 12, 2003, Ms. Berlita Benally filed a Motion for summary judgment since the issues being raised in the divorce petition for the Court to consider have been addressed in the June 11, 2001 Peacemaking session as evidenced in the Peacemaking agreement dated August 29, 2001. On February 26, 2003, Mr. Patrick Benally responded to the Motion for summary judgment arguing that the Peacemaking agreement of August 29, 2001 is not valid for enforcement because the Peacemaking Division is not legitimate and needs judges and lawyers to validate Peacemaking decisions. Mr. Benally contends that judges validate a Peacemaking agreement by ensuring that due process is afforded to the parties and that their rights are protected through the process. Mr. Benally further attests that he was coerced into making the Peacemaking agreement, that he was denied "opportunity to think about what he was agreeing to", that he was denied a lawyer, and that he misunderstood the value of the JUA House and the inability to pay half its value to Ms. Benally.

11. On March 11, 2003, the court heard oral arguments on the Petition for an order to show cause, the Motion for summary judgment, and the Motion for the homestudy. Counsel for Mr. Patrick Benally argued that a genuine issue exists precluding summary judgment, and that there should be a court order accepting or denying the Peacemaking agreement dated August 29, 2001. Mr. Benally' s counsel re-emphasized the party's rights. The Court granted Ms. Berlita's Motion for summary judgment and dismissed the Petition for divorce, and denied the Motion for homestudy.

12. "A party against whom a claim . . . is asserted . . . may . . . move with or without supporting affidavits for summary judgment in the party's favor upon all or any part of the claim" *See* Rule 56(b), Navajo Rules of Civil Procedure. A party opposing the motion must file affidavits, memoranda

or both after the motion is made. *See* Rule 56(c), *Id.* The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See id.*

13. The trial court may enter a judgment upon a peacemaking agreement if (1) the court has personal and subject matter jurisdiction, (2) all necessary parties have actual knowledge of the proposed judgment and agree to it or agree to submit the case to the peacemaker, (3) the judgment contains the complete agreement of the parties and there is sufficient information regarding the full agreement so future disputes will not arise, and (4) the proposed judgment is otherwise proper and enforceable. A judgment based upon the peacemaking agreement is valid if those conditions have been satisfied. *See* Rule 4.3, N.P.C.R., *See also In re Estate of Kindle (Descheene v. Light)*, 2 Nav. A.R. 627 (Nav. Sup. Ct. 2001).

14. In November 2002, the Navajo Council passed the Fundamental Laws of *Diné* to start aligning the Navajo government and people with Navajo traditional laws and values since "knowledge and practice of these laws are fading and the tribe is experiencing many forms of negative behavior and occurrences." 5. The Navajo Nation Council finds that "the *Diné* Life Way must be protected and assured by incorporating these fundamental laws into the Navajo Nation Code in a manner that will openly acknowledge and recognize their importance and would generate interest to learn among all *Diné*." 'The Navajo Nation Council further finds that all elements of the government must learn, practice and educate the *Diné* on the values and principles of these laws; when the judge adjudicate a dispute using these fundamental laws, they should be thoroughly explained so that we can all learn;. . ." *See Amending Title 1 of the Navajo Nation Code to Recognize the Fundamental Laws of the Diné*. Navajo Nation Council Resolution No. CN-69-02 (November 13, 2002)(emphasis added).

## ANALYSIS

The summary judgment argument raised by Ms. Berlita Benally is based on the issue of the validity of the Peacemaking agreement. Rule 4.3 of the Navajo Peacemaker Court Rules, the rule of making a peacemaking agreement valid by turning it into a court order, was clear when there was no Fundamental Laws of *Diné*. However, when the Navajo Council enacted the Fundamental Laws of *Diné*, the force of agreements from the Peacemaking Division became an issue. After November 2002, the Navajo Judicial Branch needed to explain the direction of the Peacemaking Division as an institution emphasizing traditional Navajo laws. This is apparent in their motions regarding summary judgment. The parties cite to different rules for Peacemaking: *Peacemaker Rules Of The Navajo Nation* that is found within the *Navajo Practice Book (T & B Publishing, Fourth Edition, 2002)*, and

*Navajo Peacemaker Court Manual (source unknown)*. Additionally, when this court researched rules and policies governing Peacemaking, this court found different policies governing Peacemaking in the various districts. Thus, this court is under the impression that there is no single policy for the Peacemaking Division and that there is a need to further clarify the role of Peacemaking within the Navajo Judicial System. Thus now, based on the foregoing findings, this court must decide whether a Peacemaking agreement that is not incorporated into a court order is valid and can be enforced. This court is also pressed to reconcile the role of due process and individual rights in the Peacemaking Division. If the court finds that the Peacemaking agreement must be incorporated into a court order, then the court must deny the motion for summary judgment since the issues raised by Mr. Patrick Benally (divorce, custody, child support, and visitation) are still issues to be decided by the court. That would necessitate the need for trial and judgment cannot summarily be granted. If the court finds that Peacemaking agreements are enforceable even without converting them into a court order, then the court must grant judgment summarily since the matter has already been decided.

In beginning to determine Peacemaking's role in the Navajo Government, this court begins with the Fundamental Laws of *Diné* that was passed by the Navajo Council in November 2002. The Navajo Council passed the Fundamental Laws of *Diné* to start aligning the Navajo government and people with Navajo traditional laws and values since "knowledge and practice of these laws are fading and the tribe is experience many forms of negative behavior and occurrences." *See Amending Title 1 of the Navajo Nation Code to Recognize the Fundamental Laws of the Diné.* Navajo Nation Council Resolution No. CN-69-02 (November 13, 2002). The tribal government was designed mostly by federal officials dictating to tribal members. The Fundamental Laws of *Diné* reminds us that Navajos need to start developing their own government according to their laws, traditions, and customs. This law is a mark of Navajo autonomy.

Another consideration is the United States' policy regarding Indian nations. Throughout its history, the United States Government has implemented mostly destructive and racist policies against Indian nations, including the Navajo Nation. Although scholars in Indian law purport that the federal policy for Indian nations today is self-determination, this court perceives a different view. In the United States Supreme Court's first federal Indian law case, the Court, while discussing the Doctrine of Discovery and subduing the Indians, made the following remarks:

> The title by conquest is acquired and maintained by force. The conqueror prescribes its limits. Humanity, however, acting on public opinion, has established, as a general rule, that the conquered shall not be wantonly oppressed, and that their condition shall remain as eligible as is compatible with the objects of the conquest. *Most usually, they are*

*incorporated with the victorious nation, and become subject or citizens of the government with which they are connected. The new and old members of society mingle with each other; the distinction between them is gradually lost, and they make one people.* Where this incorporation is practicable, humanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their ancient connexions, and united by force to strangers.

When the conquest is complete, and the conquered inhabitants can be blended with the conquerors, or safely governed as a distinct people, public opinion, which not even the conqueror can disregard, imposes these restraints upon him; and he cannot neglect them without injury to his fame, and hazard to his power. *See Johnson v. M'Intosh,* 21 U. S. (8 Wheat.), 543 (1823) (emphasis added).

The United States' policy for tribes today is to assimilate its members into mainstream America in accordance with Chief Justice Marshall's policy. This Court is impressed that Navajo People today are incorporating into the American melting pot, and the members of each society are mingling with each other. Today, the Navajo Nation is experiencing a rapid loss of its language due to the subordination by the American dominant society. *See* Deborah House, *Language Shift Among the Navajos: Identity Politics And Cultural Continuity* (The University of Arizona Press 2002). Whether the distinction between American society and Navajo society will be lost such that they make one people is to be seen. To this court, Navajo traditional laws and values are what make Navajos distinct from Americans. Maintaining a distinct culture is important to this court for purposes of maintaining Navajo identity, Navajo land, and Navajo resources. Those are the purposes for which the Navajo Government was created. When Navajos are no longer distinct, non-Indians will urge the federal government to dissolve its treaty obligations to the Navajos to open reserved land and resources to the public domain. The American Government today is already beginning to avoid its trust responsibility. *See United States v. Navajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (The U.S. Supreme Court avoided the Tribe's claim that the federal government violated its trust responsibility to the Tribe). In interpreting the Navajo statute emphasizing Navajo laws and values, the Fundamental Laws of *Diné*, this court brings these concerns regarding the federal assimilationist policy. This court assumes that the Navajo Nation Council had these concerns when the council delegates were drafting the Fundamental Laws of *Diné*.

From another angle, the United States Judicial Branch's policy regarding Indians today is terminating tribal governments. The most recent line of cases substantially affecting Indians have diminished tribal jurisdiction, the tribes' power to govern their own territories. For instance, *see Oliphant v. Suquamish*

*Indian Tribe*, 435 U.S. 191, 98 S. Ct. 1011, 55 L.Ed.2d 209 (1978)(Indian tribe does not have jurisdiction over non-Indians committing crime on reservation), *See also Montana v. United States*, 450 U.S. 544,101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (Tribes do not have civil jurisdiction over non-Indians unless there is a direct effect on the tribe, or a consensual relationship between the tribe and the non-Indian). In these recent cases, the U.S. Supreme Court suggests that tribal courts need to mirror federal and state courts to be legitimate. *See Nevada v. Hicks*, 533 U.S. 353, 384, 121 S.Ct. 2304, 2323, 150 L.Ed.2d 398, 423 (2001)(Souter, D., concurring)(Tribal courts need to prioritize individual rights). In the present case, Mr. Patrick Benally's contention, that this court must protect his individual rights in Peacemaking, is not directed at the tribe's governance over non-members, but at its self-governance (the Nation governing its own members). The court acknowledges these broader considerations in attempting to define Peacemaking's role in the Navajo government today.

The role of Peacemaking is to preserve and promote the traditional Navajo laws and values of *k'é* among Navajo people as mandated by the Fundamental Laws of *Diné*. Does this court recognize Peacemaking agreements even without a court order? To answer the pressing question, this court recognizes Peacemaking agreements even without a court order. Peacemaking agreements do not have to be incorporated into court orders to be enforceable. In this case, "enforceable" means being recognized by the District Court for purposes of not visiting he same issues again in a court trial and therefore rending judgment summarily.

Peacemakers are experts of the fundamental law of *k'é* which is central to Navajo philosophy and law. Peacemakers emphasize *k'é* as the top value in their proceedings: Proceedings center around *k'é*. The law of *k'é* plays throughout Navajo society, even in the Judicial Branch of the Navajo Government. The Judges' Code of Conduct indicates, "A judge should behave to everybody as if they were his or her relatives." *See* Canon 1, Section 3, Navajo Nation Judicial Code of Conduct (1991). Relatives are the epitome of *k'é*. Thus, even judges are subject to learn *k'é*. As experts of the *k'é* principle, peacemakers are legitimate, contrary to Mr. Patrick Benally's assertions. In fact, the Navajo Nation Peacemaking system is renowned throughout the nation and the world. Some argue that the Peacemaking system may address social problems better than a system based on adversity, punishment and power. *See* E.g., Gross Eric K, *Evaluation and Assessment of Navajo Peacemaking* (Report to U.S. Department of Justice) (1999) (Contending that upon research, Peacemaking is more effective than family court in reducing conflict within and between families and neighbors).

In his response to summary judgment, Mr. Patrick Benally suggests that lawyers and judges are needed to ensure that the individual rights of parties that go through Peacemaking are not violated. In this court's view, individual rights do not belong in the Peacemaking forum for the following reasons. The Navajo Nation adopted the Navajo Bill of Rights in 1967 right before the Indian Civil

Rights Act was enacted. The Navajo Government only adopted its own individual rights protections to mirror the United States Government. The Navajo Government made this move to be acknowledged by the American Government. The United States Supreme Court also indicated that a tribal self-governmental practice that reflects the tribal traditional customs and practices is not barred by rights afforded in the Indian Civil Rights Act. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S. Ct. 1670, 56 L.Ed.2d 106 (1978). However, upon inquiry into individual rights, individual rights do not fit in the Navajo Peacemaking forum according to the following analysis. As a starting point, individual rights are a basic foundation of American government and society. The purpose of individual rights is to protect the individual from governmental intrusions into personal liberties. Historically, personal liberties were created to keep the government from becoming too powerful and abusive. *See* Glasser, Ira, *Visions of Liberty: The Birth of the Bill of Rights* (Arcade Publishing, 1991). Before Europeans immigrated to America, the English Crown tended to engage in abusive practices against its own English People. For E.g., *See Declaration of Independence* para. 2-21 (U.S. 1776)(Listing some of the abusive practices committed by the King of England against the colonists). The founding fathers wanted to avoid that type of abusive government. Therefore, the founding fathers identified a set of rules that limited the government's use of power against its own people. The purpose of these rules was to protect individuals from unwarranted governmental intrusions. The founding fathers recognized the Bill of Rights and incorporated it into its governmental foundation, the Constitution. The American Government, being premised upon power, naturally evolved into a coercive government. The American Government, like its English predecessor, forcefully took life, liberty, limb, and property. This is apparent in criminal law today. The government takes away liberty by incarceration, life by capital punishment, and property by fines. (The practice of cutting off limbs is obsolete today.) Thus, the founding fathers indicated that due process shall be afforded to those whose life, liberty, and property was at stake by the government. *See e.g.*, 5th and 14th Amendments of the U. S. Constitution (". . .nor shall any state deprive any person of life, liberty, or property, without due process of law."). The due process clause became extremely important considering the adversarial and coercive nature of the American legal system. With this background, this Court asks whether individual rights fit within Peacemaking. Unlike the adversarial American legal system, where parties win and lose and the court forces its judgment, Peacemaking is not premised upon adversity nor coercion. Peacemaking is premised upon *k'é* which is opposite to adversity and coercion. Peacemaking is premised upon cooperation, sharing, and helping each other. Peacemaking emphasizes maintaining positive relations by acknowledging and tending to responsibilities toward one another. Peacemaking does not focus on taking away a party's life, property, nor liberty, Even if it did, the Major Crimes Act and Indian Civil Rights Act forbids tribes from exercising capital punishment, imprisoning a

person for more than five years, and imposing a fine of more than $5000. *See* Major Crimes Act, 18 U.S.C.A. §1153 (1885), *See also* Indian Civil Rights Act, 25 U.S.C. §§ 1301 –1303 (1968)(amended 1986). Rather, Peacemakers focus on solving the problems brought by parties using the *k'é* principle. In the American legal system, individual rights, when used properly, protect parties. When abused, lawyers tactically use individual rights against each other to win the case and address the problem by retribution (i.e., revenge). As legal devices engineered for an adversarial coercive system, individual rights do not belong in Peacemaking because Peacemaking encourages making peace and not adversity. Peacemakers want to focus on solving the substance of the problem, rather than focusing on procedural issues for due process as in the American legal system. Because Peacemaking and the legal system are premised on different foundations, and to encourage *k'é*, individual rights do not belong in Peacemaking sessions. Mr. Patrick Benally argues that judges and lawyers are needed to ensure that parties' individual rights are protected. However, since individual rights do not belong in Peacemaking according to the above-reasoning, then there is no need for a judge to check for individual rights in Peacemaking agreements. What replaces due process and individual rights if rights are prohibited in Peacemaking? The concept of *k'é* fills that void. Due process is fairness in the adversarial system. *K'é* incorporates fairness, but in the context of cooperation, sharing, and caring for each other. In caring for each other, a person treats each other fairly by giving equal treatment. Rather than favoring one person over another, all persons are treated equally under the *k'é* principle.

Mr. Patrick Benally contests that he was pressured into the Peacemaking agreement on August 29, 2001. This Court stresses that Mr. Benally requested Peacemaking himself. The Court did not order him to attend Peacemaking for divorce. Mr. Benally voluntarily sought Peacemaking on June 11, 2001. It is impossible for a person who voluntarily participates in an agreement to be coerced. If it is voluntary, then the person can disengage and discontinue participating. To the contrary, to support the child support amount set by the Court following the Navajo Nation Child Support Guidelines, Peacemaking emphasized Mr. Patrick Benally's responsibility to provide for his children as a father. Teaching about responsibility is not coercion. In fact, with the high rate of single parents on the Navajo Reservation, this court supports the encouragement of parental responsibility. This court supports the Peacemakers teaching about parental responsibility. As to the issue of coercion, this court takes judicial notice that Peacemakers operate on the *k'é* principle. Therefore, it presumes that agreements reached in Peacemaking are fair and without duress and coercion because the parties enter into agreements voluntarily.

One role of Peacemaking is to preserve and promote the traditional Navajo laws and values of *k'é* among Navajo people as mandated by the Fundamental Laws of *Diné*. When the Navajo government passed the Fundamental Laws of *Diné*, many wondered what its effect would be on the Navajo Nation Bill of

Rights, particularly when the Fundamental Laws of *Diné* were placed before the Navajo Nation Bill of Rights in Article 1 of the Navajo Nation Code. This analysis initiates defining the impact of the Fundamental Laws of *Diné* on the Navajo Bill of Rights, the rest of the Navajo Code, and court cases. In light of the United States' history and policies with respect to Indian nations, and the Navajo Nation being at the forefront, this court rigorously reinforces the Peacemaking Division. Thus, Peacemakers play a legitimate role in Navajo government comparable to judges. Peacemaking decisions do not have to be incorporated into a court order to be recognized and enforced in the Kayenta Judicial District. Further, individual rights may be appropriate for the adversarial legal system, but individual rights do not belong in the Peacemaking forum. Finally, there is a presumption that agreements reached in Peacemaking sessions are fair and without duress and coercion because parties participate voluntarily.

Pursuant to Rule 56(b) of the Navajo Rules of Civil Procedure, Ms. Berlita Benally's pleadings and exhibits show that there is no genuine issue as to any material fact and that she is entitled to a recognition of the divorce made in the Peacemaking Division. Further, the Fundamental Laws of *Diné* recently enacted by the Navajo Council, supercedes Rule 4.3 of the Navajo Peacemaker Court Rules, which is the standard set in *In re Estate of Kindle*, 8 Nav. R. 150 (Nav. Sup. Ct. 2001).

## CONCLUSIONS

1. Peacemaking agreements do not have to be made into a court order for them to be enforceable.

2. There is a presumption that agreements reached in the Peacemaking Division are fair and without duress and coercion because the parties enter into the agreements voluntarily.

3. Individual rights do not belong in Peacemaking because individual rights are premised upon an adversarial system contrary to Peacemaking.

## JUDGMENT

Based on the foregoing, the court hereby GRANTS Ms. Berlita Benally's Motion for Summary Judgment since this matter has already been determined by the Peacemaking Division on August 29, 2001 pursuant to the analysis above. The court further recognizes the divorce rendered by the Peacemaking Division because Peacemakers are competent with *k'é* principles that make Navajo laws. Thus, the Petition for divorce, along with the motions for *res judicata*, joinder, and homestudy are hereby DISMISSED with prejudice. The motion for order to show cause is DISMISSED without prejudice since that motion also relates to the Amended Order that was issued prior to the divorce petition. Any new issues that arise, or may have arisen, related to the Peacemaking agreement may be addressed by making a request to modify their agreement either through this court or through Peacemaking.