RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0249p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

FORD MOTOR COMPANY,

　　　　　　　　　*Plaintiff-Appellant,*

　　　　　　　　　　　　　　　　　　　No. 10-1934

*v.*

UNITED STATES OF AMERICA,

　　　　　　　　　*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:08-cv-12960—Patrick J. Duggan, District Judge.

Argued: July 29, 2014

Decided and Filed: October 1, 2014

BEFORE: BATCHELDER, GIBBONS, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Gregory G. Garre, LATHAM & WATKINS LLP, Washington, D.C., for Appellant. Arthur T. Catterall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Gregory G. Garre, Katherine I. Twomey, LATHAM & WATKINS LLP, Washington, D.C., Richard E. Zuckerman, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellant. Arthur T. Catterall, Gilbert S. Rothenberg, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

　　　　GIBBONS, J., delivered the opinion of the court, in which BATCHELDER, J., joined, and ROGERS, J., joined except for Part III.A. ROGERS, J. (pg. 20), delivered a separate concurring opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.　Ford Motor Company remitted hundreds of millions of dollars to the United States Treasury after the Internal Revenue Service (IRS) notified Ford that it had underpaid its taxes in prior years.　Ford designated the funds as "deposits in the nature of a cash bond" but later asked the government to convert its remittances into "advance tax payments," which are treated differently under the IRS's revenue procedures.　When the government subsequently reexamined its computations and determined that Ford had *overpaid* its taxes in the relevant timeframe, the United States refunded Ford's payments with interest. But the government refused to pay Ford any interest for the period during which the United States held Ford's money as deposits—before the remittances were converted to advance tax payments.　Ford demands about $450 million in additional interest from the government.　The district court rejected Ford's claim, and so do we.

**I.**

Corporate tax returns, like individual tax returns, are subject to audit by the IRS.　*See generally* 34 Am. Jur. 2d Federal Taxation ¶ 70000 *et seq.*　When the taxpayer is a large corporation such as Ford, however, it often takes years for the IRS to conduct an audit and to assess the corporation's tax liability for any particular year.　That delay can be costly.　In the event the IRS ultimately determines that the taxpayer *underpaid* its taxes, federal revenue laws make the taxpayer liable for underpayment interest that accrued while the IRS analyzed the taxpayer's tax liability.　26 U.S.C. § 6601(a).　But the risk runs both ways.　If the IRS ultimately determines that the taxpayer *overpaid* its taxes for the year under scrutiny, the government is on the hook for overpayment interest, which accrues from "the date of the overpayment."　26 U.S.C. § 6611(b)(2).

Ford remitted approximately $875 million to the United States in the 1990s after the IRS initiated an audit and preliminarily determined that Ford had underpaid its taxes by nearly $2 billion during the preceding decade.　Ford sent the money pursuant to Revenue Procedure 84-

58, which allows taxpayers to remit funds to stop the accrual of underpayment interest.  *See* Rev. Proc. 84-58, 1984-2 C.B. 501, *superseded by* Rev. Proc. 2005-18, 2005-1 C.B. 798.  The revenue procedure identifies two distinct types of tax remittances: "deposits in the nature of a cash bond" and "advance tax payments."  Ford designated each of its payments as a deposit in the nature of a cash bond, which the IRS says is "made merely to stop the running of [underpayment] interest," "is not a payment of tax," and "if returned to the taxpayer, does not bear interest."  *Id.* § 2.03.  Only later did Ford ask the IRS to treat its remittances as advance tax payments, which do bear interest in the event of an overpayment.  *Id.* § 5.05.  The IRS complied and converted Ford's deposits into advance tax payments, applying the payments against Ford's outstanding tax deficiency from prior years.

The dispute in this case arose when the IRS subsequently reversed its position and concluded that the monies Ford remitted to the IRS to cover the alleged deficiencies were actually an *overpayment* of taxes due for the years in question.  The United States refunded Ford's tax remittances plus overpayment interest, as required under 26 U.S.C. § 6611.  Importantly, and at the heart of this dispute, the IRS calculated the amount of overpayment interest from the dates on which Ford requested that its deposits be converted into advance tax payments rather than from the earlier dates on which Ford remitted the deposits.  Ford believes the interest started to accrue on the deposit dates.

In July 2008 Ford filed a complaint in federal district court seeking $445 million in unpaid interest.  Two years later the district court granted the government's motion for judgment on the pleadings.  The district court believed that it had to defer to the IRS's interpretation of the Internal Revenue Code as long as that interpretation was reasonable.  In Revenue Procedure 84-58 the IRS interpreted § 6611 to require the government to pay interest only on overpayments designated as advance tax payments; in its view, taxpayers are not entitled to overpayment interest on remittances held as cash-bond deposits because there can be no overpayment of tax, and therefore no overpayment interest, until a taxpayer converts its cash-bond deposit into an advance tax payment.  The district court deemed that interpretation to be reasonable and therefore upheld the IRS's calculation of Ford's overpayment interest.  *Ford Motor Co. v. United States*, No. 08-12960, 2010 WL 2231894, at *7 (E.D. Mich. June 3, 2010).

Ford appealed the district court's decision to this court, and although the government abandoned its quest for regulatory deference, we affirmed. *Ford Motor Co. v. United States*, 508 F. App'x 506 (6th Cir. 2012), *vacated*, 134 S. Ct. 510 (2013). We held that the canon of strict construction applicable to waivers of sovereign immunity required us to interpret § 6611 narrowly. We therefore rejected Ford's attempt to interpret the term "overpayment" in § 6611 to encompass both deposits and advance tax payments, as the IRS defines those terms.

Ford filed a petition for rehearing *en banc*, arguing for the first time that § 6611 was not a waiver of sovereign immunity. Instead, Ford argued that the applicable immunity waiver came from 28 U.S.C. § 1346(a)(1)—the statute that vested the district court with jurisdiction to adjudicate Ford's case. Ford had not raised that argument in its briefs, and both this panel and the *en banc* court declined to rehear the appeal.

Ford then petitioned the Supreme Court for a writ of *certiorari*. In its opposition to that petition the United States argued that the district court (and therefore this court) lacked jurisdiction to hear this case. The government argued that § 1346(a)(1) does not apply to this claim and that "the only general waiver of sovereign immunity that encompasses [Ford's] claim is the Tucker Act, 28 U.S.C. § 1491(a), which requires that suit be brought in the United States Court of Federal Claims." In a footnote, the government acknowledged that it had not made this jurisdictional argument in the proceedings before this court because the jurisdictional question is foreclosed by *E.W. Scripps Co. v. United States*, 420 F.3d 589 (6th Cir. 2005).

The Supreme Court granted Ford's petition for a writ of *certiorari*, vacated the panel's decision, and remanded the case to this court. The Court stated:

> The Sixth Circuit should have the first opportunity to consider the Government's new contention with respect to jurisdiction in this case. Depending on that court's answer, it may also consider what impact, if any, the jurisdictional determination has on the merits issues, especially whether or not § 6611 is a waiver of sovereign immunity that should be construed strictly.

*Ford Motor Co. v. United States*, 134 S. Ct. 510, 511 (2013). Ford's appeal is once again ripe for our review.

## II.

At the outset we must consider the question of jurisdiction—one of the two bases on which the Supreme Court remanded the case to this court.  Ford invoked the district court's jurisdiction under 28 U.S.C. § 1346(a)(1), which vests the district courts with jurisdiction to hear claims "for the recovery of any . . . sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."  In its opposition to Ford's *certiorari* petition the government argued that § 1346(a)(1) does not confer jurisdiction over this claim because Ford does not seek to *recover* money already paid; rather, it demands interest that the IRS steadfastly refuses to pay.  The government maintains that "the only general waiver of sovereign immunity that encompasses [Ford's] claim is the Tucker Act, 28 U.S.C. § 1491(a), which requires that suit be brought in the United States Court of Federal Claims."

Although the Supreme Court remanded Ford's appeal to this court "to consider the government's new contention with respect to jurisdiction in this case," both the United States and Ford acknowledge that the government's jurisdictional challenge is foreclosed by *E.W. Scripps Co. v. United States*, 420 F.3d 589 (6th Cir. 2005).  In *Scripps* this court held that § 1346(a)(1) confers jurisdiction on the federal district courts to adjudicate claims for overpayment interest because the term "recovery of any sum" in that statute includes suits to obtain overpayment interest.  420 F.3d at 597 (citing *Flora v. United States*, 362 U.S. 145, 149 (1960)).  We concluded that our interpretation of § 1346(a)(1) was consistent with *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986), where the Court held that the United States is immune from any suit to obtain interest in the absence of express congressional consent to an award of interest.  We noted that 26 U.S.C. § 6611, which specifically permits taxpayers to sue the government for overpayment interest, constitutes an express congressional waiver of the government's immunity from suits to recover interest.  *Scripps*, 420 F.3d at 597.

The government encourages this panel *sua sponte* to poll the *en banc* court to gauge its interest in revisiting the issue decided in *Scripps*.  *See* 6th. Cir. I.O.P. 35(e) ("[A]ny member of the en banc court may sua sponte request a poll for hearing or rehearing en banc before a party files an en banc petition.").  We decline the government's invitation and therefore are bound by *Scripps*, which undeniably affirms the district court's jurisdiction to decide this case.

**III.**

We proceed to the merits. Ford insists that its remittances began to accrue overpayment interest on the date Ford sent them to the government, even though Ford initially designated its remittances as cash-bond deposits rather than advance tax payments. In Ford's view the "conversion" of its deposits into advance tax payments had retroactive effect, and accordingly "the date of the overpayment" under 26 U.S.C. § 6611 was the date that Ford submitted each deposit to the United States. The government disagrees. It argues that there cannot be an overpayment until there is a payment, and both the ordinary meaning of the term "payment" and Revenue Procedure 84-58 make clear that a deposit in the nature of a cash bond is not a payment for purposes of § 6611. Both parties offer imaginative and convoluted theories to support their arguments, but the interpretive dispute that we must resolve is ultimately a simple one.

**A.**

First we return to the canon of strict construction, as the Supreme Court specifically invited us to reconsider whether § 6611 is a waiver of sovereign immunity that must be strictly construed, and the parties ask us to confront that question at the outset. After concluding that both Ford and the United States offered "plausible" interpretations of the term "overpayment" in § 6611, our initial opinion relied on the canon of strict construction to tip the scales in favor of the government. That canon provides that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). But our decision was predicated on the assumption, propounded by the United States and unchallenged by Ford, that § 6611 provided the applicable waiver of sovereign immunity. On remand from the Supreme Court we invited the parties to submit supplemental briefs in this appeal, and the parties have focused their arguments on this question.

A few courts have concluded (some in *dicta*) that § 6611 waives the government's sovereign immunity with respect to suits for interest. *See Exxon Mobil Corp. & Affiliated Cos. v. C.I.R.*, 689 F.3d 191, 202 (2d Cir. 2012); *Int'l Bus. Mach. Corp. v. United States*, 201 F.3d 1367, 1371, 1374–75 (Fed. Cir. 2000); *Schortmann v. United States*, 82 Fed. Cl. 1, 6 (2008). But Ford argues that § 6611 creates a substantive right to interest rather than a waiver of the government's sovereign immunity. Ford relies on cases such as *United States v. Mitchell*, 463 U.S. 206 (1983),

*United States v. Navajo Nation*, 537 U.S. 488 (2003), *Gomez-Perez v. Potter*, 553 U.S. 474 (2008), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003), to differentiate between jurisdictional statutes that waive the government's immunity and substantive provisions that establish a right to relief. Because § 6611 defines the scope of a taxpayer's right to sue for interest but does not confer jurisdiction on the courts to adjudicate those claims, Ford argues, the canon of strict construction plays no role in defining the scope of the taxpayer's right to interest under § 6611.

Ford is indeed correct to differentiate between jurisdictional waiver provisions and substantive statutes. In *Mitchell*, the Supreme Court noted that the Tucker Act waived the government's immunity from "suit for claims founded upon statutes or regulations that create substantive rights to money damages" and that "the separate statutes and regulations" creating the substantive rights "need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." 463 U.S. at 218–19. The Court invoked this same principle in *Navajo Nation* to distinguish the Indian Tucker Act, which "confers jurisdiction upon the Court of Federal Claims," from separate "rights-creating source[s] of substantive law" that entitle claimants to damages but do not constitute separate immunity waivers. 537 U.S. at 503. And in *White Mountain Apache Tribe*, another sovereign-immunity case decided the same day as *Navajo Nation*, the Court once again emphasized that the showing required to establish a right to relief under a substantive statute is "demonstrably lower than the standard for the initial waiver of sovereign immunity." 537 U.S. at 472.

The government contends that interest is different, and indeed it is. Three years after *Mitchell* the Court decided *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986), which held that a suit for interest cannot be sustained against the United States unless there exists an "express congressional consent to the award of interest separate from a general waiver of immunity to suit." The Court referred to the requisite substantive interest provision as a "separate waiver" of sovereign immunity, *id.*, and noted that the United States retains its "immunity from awards of interest" unless Congress specifically authorizes an award of interest in that separate immunity waiver, *id.* at 317. *Shaw* thus appears to require *two* waivers of sovereign immunity in the context of a suit against the government to obtain interest—one

*jurisdictional* waiver establishing the right to bring suit in an appropriate court, and a second *substantive* waiver expressly authorizing an award of interest.

Because sovereign-immunity waivers must be strictly construed, the government contends, any doubts about whether Ford's deposits constituted "overpayments" under § 6611 must be resolved in favor of the United States.  Properly interpreted, however, *Shaw* does not stand for the proposition that any ambiguity in the scope of a statutory interest provision must be resolved in the government's favor.  It stands instead for the proposition that a litigant may not sue the United States to recover interest unless Congress has expressly authorized suits for interest.  *See Missouri v. Jenkins*, 491 U.S. 274, 280 (1989) ("*Shaw* involved an application of the longstanding 'no-interest rule,' under which interest cannot be awarded against the United States unless it has expressly waived its sovereign immunity.").  "[O]nce Congress has waived sovereign immunity over certain subject matter, the [courts] should be careful not to 'assume the authority to narrow the waiver that Congress intended.'"  *Ardestani v. INS*, 502 U.S. 129, 137 (1991) (quoting *United States v. Kubrick*, 444 U.S. 111, 118 (1979)).

*Shaw* did not interpret the scope of an interest provision; rather, it asked whether 42 U.S.C. § 2000e-5(k), which allows the courts to award attorney's fees against the government in civil-rights cases, could fairly be interpreted to authorize an award of interest on those attorney's fees.  *Shaw*, 478 U.S. at 319.  To be sure, *Shaw* reiterated the common refrain that the canon of strict construction applies to all waivers of sovereign immunity, adding that the "no-interest rule provides an added gloss of strictness upon" the strict-construction canon.  *Id.* at 318–19.  But once one gets past that rote statement of general immunity law, the actual analysis in *Shaw* reveals that the Court intended those statements to prevent courts from interpreting generally applicable statutes too broadly to permit awards of interest against the government when the statute does not expressly contemplate an award of interest.  *See id.* at 318 ("When Congress has intended to waive the United States' immunity with respect to interest, it has done so expressly.").  The Court went on to list several statutes that expressly authorize awards of interest against the government, using these statutes as examples of situations where Congress has waived the government's sovereign immunity.

Our interpretation of *Shaw* is consistent with the general purpose of sovereign immunity, which is to shield the government from suit—not from liability. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). Sovereign immunity is a jurisdictional doctrine. *Id.* It bars the courts from adjudicating certain types of claims made against the sovereign; it does not require the courts to resolve all ambiguities in substantive statutory provisions in the government's favor. The government's view of *Shaw* would require the courts to draw every possible inference against a litigant seeking interest. That is plainly not what *Shaw* had in mind, and it would drastically distort sovereign-immunity jurisprudence to use the narrowing lens of the canon of strict construction to constrict the meaning of the statutory terms that define a substantive right to relief. *Cf. United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 383 (1949) ("'The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced.'" (quoting *Anderson v. John L. Hayes Constr. Co.*, 153 N.E. 28, 29–30 (N.Y. 1926) (Cardozo, J.))).

There is accordingly no basis in the Supreme Court's sovereign-immunity jurisprudence for applying the canon of strict construction to interpret the word "overpayment" in § 6611 to bar taxpayers from demanding interest on remittances that are designated as deposits in the nature of a cash bond. Nothing about the term "overpayment" suggests that Congress intended to waive the government's sovereign immunity only with respect to remittances designated as advance tax payments. Indeed, the terms "deposit in the nature of a cash bond" and "advance tax payment" did not appear in the Internal Revenue Code when Ford made these remittances. The distinction between those types of remittances was invented by the IRS, not Congress, and the concept of a "deposit in the nature of a cash bond" did not arise until after Congress enacted § 6611. The distinction between deposits and advance tax payments therefore does not implicate the government's sovereign immunity; it relates only to the scope of the substantive right.

**B.**

We employ the usual tools of statutory interpretation to determine whether "the date of the overpayment" under § 6611 was the date Ford remitted its deposits, as Ford contends, or the date the IRS converted its deposits into advance tax payments, as the government contends. This court begins any statutory-interpretation analysis "by examining the language of the statute itself

to determine if its meaning is plain." *Nat'l Air Traffic Controllers Ass'n v. Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) (internal quotation marks omitted). "Plain meaning is examined by looking at the language and design of the statute as a whole." *Id.* (internal quotation marks omitted). We "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) (internal quotation marks omitted).

**1.**

We look first at the plain language of the statute. Section 6611(b)(1) says that the United States must pay overpayment interest from "the date of the overpayment." An overpayment is "any payment in excess of that which is properly due," *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947), and dictionaries define the word "payment" as "the act of paying or giving compensation: the discharge of a debt or an obligation." Webster's Third New International Dictionary 1659 (1981). That definition focuses on the purpose with which a person or entity sends the funds: A remittance is a payment when it is given to discharge a debt or obligation.[1] Whether Ford's cash-bond deposits were payments under § 6611 thus turns on whether they were made for the purpose of discharging its estimated tax obligations.

That Ford remitted its deposits before the IRS had finally determined its tax liability is of no moment. The revenue laws are clear (though perhaps verbose) on this point: "An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid." 26 U.S.C. § 6401(c).

---

[1]Black's Law Dictionary uses a slightly different definition that focuses on the intent of the putative payee rather than the payor. *See* Black's Law Dictionary (9th ed. 2009) (defining payment as "[p]erformance of an obligation by the delivery of money . . . *accepted in partial or full discharge of the obligation*" (emphasis added)). In the context of interpreting § 6611, however, it would be inappropriate to permit the IRS, as the putative payee, to determine whether a specific remittance constitutes a payment. If, for example, a taxpayer remits funds to the IRS and designates the remittance as an advance tax payment to be allocated to a specific tax deficiency, and the IRS negligently fails to record the remittance as a payment and instead places the funds into some reserve account, the IRS's error should not affect whether the remittance is deemed to be a payment within the meaning of § 6611.

Thus a corporation such as Ford may "pay" its tax obligations upon receipt of a preliminary notice of tax deficiency, even before the obligations are finalized or otherwise become due.[2]

According to IRS revenue procedures in effect at the time, both cash-bond deposits and advance tax payments stopped the government from charging interest on an estimated tax underpayment while the IRS finalized its tax assessment (as long as the deposit was eventually posted against the assessment.)  But the revenue procedures treated deposits and advance tax payments differently in one important respect: A taxpayer could demand the immediate return of a deposit anytime, while an advance tax payment would be returned only through the IRS's formal refund process, which take's time.  *See* Rev. Proc. 84-85 § 4.02.1.  So when Ford sent its remittances, it faced a tradeoff: If a taxpayer remitted a cash-bond deposit but subsequently demanded the deposit's return, the IRS would not pay the taxpayer any interest for the period during which the government held the funds.[3]  When a taxpayer demanded a refund of an excessive advance tax payment, by contrast, the IRS allowed the taxpayer to recoup interest.  Thus the revenue procedures forced taxpayers to choose: immediate access without interest, or interest without immediate access.

Considered in this context, Ford's purpose comes more sharply into focus, *see Dolan v. U.S. Postal Serv.,* 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."), and belies any claim that Ford's purpose in remitting the cash-bond deposits was to discharge its estimated tax obligations.  Ford could have designated its remittances as advance tax payments and instructed the IRS to apply its remittances against any tax liability ultimately assessed.  Both parties agree that would have been a "payment" because such a remittance would have been made for the purpose of

---

[2]This statute is one reason we do not rely on *Rosenman v. United States*, 323 U.S. 658 (1945), to guide our interpretation of § 6611.  In *Rosenman*, the Court stated that a deposit in the nature of a cash bond was not a payment, noting that the United States regularly refused to pay overpayment interest on such deposits when the deposit turned out to be in excess of the tax liability eventually assessed. *Id.* at 662–63.  But *Rosenman* held that the remittances in question could not be payments in part because the government had not yet assessed any tax.  *See id.* at 662.  That reasoning is inconsistent with § 6401(c), enacted in response to *Rosenman*, which explicitly rejects the notion that interest cannot accrue until a tax is actually assessed.

[3]This revenue procedure has been abrogated in part by 26 U.S.C. § 6603.

satisfying the estimated tax deficiency.  Yet Ford chose instead to designate its remittances as deposits.  Ford is a sophisticated taxpayer, and its designation of the remittances was not accidental.  A taxpayer's deliberate decision to designate its remittance as a deposit rather than an advance tax payment directly evidences an intent *not* to make a "payment."  That purpose is determinative

Ford invokes the use-of-money principle, a general federal policy favoring compensation for the use of taxpayer money, *see Marsh & McLennan Cos. v. United States*, 302 F.3d 1369, 1380 & n.10 (Fed. Cir. 2002), and argues that the principle requires this court to interpret § 6611 to entitle Ford to interest on its deposits.  As this court explained in *Scripps*:

> Congress, in enacting 26 U.S.C. § 6611 . . . , has made clear that it believes that taxpayers should be compensated for the lost time-value of their money when they make overpayments of tax.  The payment of statutory interest reflects an attempt to return the taxpayer and the Government to the same positions they would have been in if no overpayment had been made.  If the Government does not compensate the taxpayer for the time-value of the tax overpayment, the Government has retained more money than it is due, i.e., an "excessive sum."

*Scripps*, 420 F.3d at 597; *see also Int'l Bus. Mach. Corp.*, 201 F.3d at 1374–75 ("Congress has waived sovereign immunity in both the tax code and the customs laws to permit interest to be paid on certain refunds to allow for the time value of money when the Government has had the use for a period of time of money to which it is not lawfully entitled.  Congress has considered this to be only fair and proper.").

Yet the use-of-money principle is not absolute.  It "is merely a principle of statutory construction" that "cannot be used to trump the specific statutory scheme Congress has devised." *FleetBoston Fin. Corp. v. United States*, 483 F.3d 1345, 1353 (Fed. Cir. 2007).  Nor does the use-of-money principle trump the IRS's longstanding payment scheme.  By enacting § 6611, Congress gave life to the use-of-money principle by allowing taxpayers to earn overpayment interest on remittances paid to the United States before a final tax deficiency is assessed.  But Ford opted not to use that procedure and instead remitted deposits in the nature of a cash bond.  Ford cannot now invoke the use-of-money principle to argue that the government is improperly refusing to compensate Ford for the time-value of its money.  The United States offered to compensate Ford for the time-value of its money on the condition that Ford submit to the IRS's

refund procedures, but Ford elected not to accept the government's offer. *Cf. Marsh & McLennan Cos.*, 302 F.3d at 1381 ("The taxpayer could have sought a refund for the excess funds, or left the excess funds as an interest-bearing overpayment. A taxpayer that makes a credit elect has no one to blame but itself for the non-payment of interest on that amount.").

We conclude that Ford's cash-bond deposits were not payments, and therefore were not overpayments, because Ford did not remit those deposits to discharge its estimated tax deficiency. Rather, Ford's decision to designate its remittances as deposits rather than advance tax payments demonstrates that the sole purpose of the remittances was to stop the accrual of underpayment interest. The IRS properly refused to award Ford any interest for the period during which the United States held Ford's remittances as cash-bond deposits.

**2.**

Ford suggests that this interpretation is inconsistent with the design of the broader underpayment- and overpayment-interest scheme. To infuse consistency into Congress's scheme, Ford suggests that the "most appropriate starting point" is not the text of § 6611 but instead the language of § 6601, the provision governing *underpayment* interest. Ford contends that these two sections should be interpreted symmetrically because they each use similar language, *compare* § 6601 ("date paid"), *with* § 6611 ("date of the overpayment"), and each relates to the accrual of interest on tax payments. Its basic argument is this: Underpayment interest accrues under § 6601(a) from the date the tax is due until the date the tax is paid. The statute thus requires the IRS to charge taxpayers underpayment interest until the tax deficiency is "paid." And for underpayment purposes, unlike in the overpayment context, the IRS treats cash-bond deposits as tax payments; according to section 5.01 of Revenue Procedure 84-58, underpayment interest stops accruing on the date a remittance is received from a taxpayer, irrespective whether the taxpayer designates its remittance as an advance tax payment or a deposit in the nature of a cash bond. To maintain symmetry between these two parallel statutes, Ford argues, a deposit that qualifies as a payment under § 6601 must similarly qualify as a payment under § 6611. In other words, if a deposit *stops* the accrual of underpayment interest, a deposit also must *start* the accrual of overpayment interest.

Although Ford's plea for regulatory consistency is facially appealing, examining it beneath the surface reveals its flaws. First, Ford does not explain why our interpretation of § 6611 should turn on the IRS's interpretation of § 6601. A common canon of construction compels courts to interpret statutory terms consistently, *see Sorenson v. U.S. Sec'y of Treasury*, 475 U.S. 851, 860 (1986), but Ford seems to believe that a corollary to that canon requires courts to defer to agencies' interpretations of parallel statutory terms. Yet neither Ford nor the government suggests that the IRS is entitled to formal interpretive deference in this case, and neither rule nor canon counsels this court to interpret one statutory provision consistently with an agency's informal interpretation of another. To the extent the IRS's interpretation of §§ 6601 and 6611 needs to be harmonized with this court's interpretation of those statutes, the duty of harmonization falls on the IRS, not this court.

Second, Ford's resolution of the IRS's inconsistent enforcement of §§ 6611 and 6601 is unconvincing. Ford may be right to criticize the IRS for treating a deposit as a payment under § 6601 while refusing to treat it as a payment under § 6611, but that tells us nothing about which of the two treatments is correct. Although Ford argues that the IRS's inconsistency means that a deposit should be treated as a payment under § 6611, perhaps the converse is true—*i.e.*, a deposit should *not* be treated as a payment under § 6601, and interest should stop accruing on underpayments only upon receipt of a remittance designated as an advance tax payment. Despite the persuasiveness of Ford's plea for symmetrical interpretations, it does little to help us understand the proper meaning of the term "overpayment" in § 6611.

Third, no matter how we decide this case, taxpayers will have reason to complain about inconsistencies in the IRS's practices. If the word "payment" includes cash-bond deposits, the IRS has been improperly withholding overpayment interest from taxpayers who designate their remittances as deposits rather than advance tax payments. And if the word "payment" does *not* include deposits, the IRS has been letting taxpayers off the hook by stopping the accrual of underpayment interest as of the date that taxpayers remit a cash-bond deposit. Thus there is nothing we can do to rectify the IRS's inconsistent treatment of cash-bond deposits in this case, and the IRS's practices do not transform our duty to interpret § 6611.

**3.**

Ford also encourages us to interpret § 6611 through the lens of Revenue Procedure 84-58—or, more specifically, one isolated provision of that revenue procedure. As an initial matter, even if that provision were on point, it is not clear that an interpretation of the term "overpayment" dictated by the IRS's revenue procedures would control our interpretation of that statutory term. The government for good reason does not argue that the revenue procedure is entitled to deference. Revenue procedures are at most interpretive aids, *see Estate of Shapiro v. C.I.R.*, 111 F.3d 1010, 1017 (2d Cir. 1997) (citing *Estate of Jones v. C.I.R.*, 795 F.2d 566, 571 (6th Cir. 1986)), that do not enjoy the status of law or regulation, do not bind the courts, *Xerox Corp. v. United States*, 41 F.3d 647, 657–58 (Fed. Cir. 1994), and typically do not even bind the IRS itself, *see Shapiro*, 111 F.3d at 1017–18; *Riley v. United States*, 118 F.3d 1220, 1222 (8th Cir. 1997). Yet we need not decide whether the IRS's revenue procedures should influence our interpretation of § 6611 because we reject Ford's reading of Revenue Procedure 84-58.

Ford focuses on section 5.05 of Revenue Procedure 84-58, which reads:

Remittances treated as payments of tax will be treated as any other assessed amount and compound interest will be paid on any overpayment under section 6611 of the Code. In the event that [a] deposit in the nature of a cash bond is posted to a taxpayer's account as a payment of tax pursuant to subparagraph 3 of section 4.02, interest will run on an overpayment later determined to be due only from the date the amount was posted as a payment of tax.

In Ford's view the first sentence of section 5.05 establishes the general rule that overpayment interest will be paid on all "[r]emittances treated as payments of tax," regardless whether the IRS treats the remittance as an advance tax payment *upon receipt* or instead later "converts" a cash-bond deposit into an advance tax payment. Ford maintains that the second sentence—which is applicable only when a deposit is converted to an advance tax payment *under section 4.02* and which says that *in those circumstances* interest begins to accrue on the "conversion date" rather than the "deposit date"—is the lone exception to the general rule established in the first sentence. As Ford tells it, "[b]ecause there would be no need for such an 'exception' if interest can never begin accruing under § 6611 before the conversion date, it follows that the *general rule* must be that interest does accrue from the remittance date on a converted deposit." And because both parties agree that section 4.02 is inapplicable here, Ford

argues that the general rule in section 5.05 requires the IRS to treat its converted deposits as advance tax payments from the date of deposit rather than the conversion date.

The government notes in response that the entire concept of "conversion" is foreign to Revenue Procedure 84-58, which nowhere permits the IRS to convert a deposit in the nature of a cash bond into an advance tax payment. Although the government acknowledges that the IRS permits conversions, it suggests that a conversion is actually a "constructive return" of a taxpayer's deposit followed by the taxpayer's immediate re-submission of the deposit as an advance tax payment. Because sections 2.03 and 4.02 of Revenue Procedure 84-58 state that a taxpayer is not entitled to interest on a returned deposit, the government argues, a taxpayer who requests a conversion is not entitled to any pre-conversion interest because the government constructively returned the deposit to the taxpayer.

The government's interpretation is illogical. Section 5.01 of Revenue Procedure 84-58 says that if a taxpayer requests a deposit's return, the taxpayer does not "receive credit" for underpayment-interest purposes for the period that the deposit was held by the government. So if the United States actually "constructively returned" taxpayers' deposits whenever taxpayers requested the conversion of their deposits into advance tax payments, the constructive return of the deposit would mean the taxpayer would owe interest to the United States for the pre-conversion period that the government held the money as a deposit. But the parties agree that in practice the IRS does not charge interest for tax underpayments when it holds a sufficient deposit—even when the deposit is subsequently converted to an advance tax payment. The IRS therefore cannot be said to effect a "constructive return" of a taxpayer's deposit merely by converting it to an advance tax payment.[4]

Yet Ford's interpretation also cannot be correct. The second sentence of section 5.05 is irrelevant to this case: It applies when a payment is converted under section 4.02, and everyone agrees that is not what occurred here. The question is whether the first sentence of section 5.05

---

[4]Furthermore, it appears that the IRS, in a private-letter ruling, has contradicted the interpretation of Revenue Procedure 84-58 it now advances. *See* I.R.S. P.L.R. 8738041 (June 23, 1987). Specifically, the IRS stated that "[b]ecause the Government will have uninterrupted use of [a] remittance, the remittance will not be deemed to be returned upon redesignation as a payment of tax . . . ." *Id.* This statement appears to cut against the government's contention that converted deposits are constructively returned to the taxpayer.

should be interpreted to require the government to apply the conversion retroactively, such that a deposit that is later converted to an advance tax payment will be treated as if it were an advance tax payment the entire time the government held the money. Ford is correct that its interpretation gives meaning to the second sentence of section 5.05, which would otherwise be meaningless. But that is an insufficient basis on which to give legal effect to Ford's creative but unsubstantiated theory of retroactive conversion. We will not read the theory of retroactive conversion into section 5.05 merely to rescue one sentence from surplusage when that reading would frustrate or violate other provisions of Revenue Procedure 84-58, including the numerous provisions stating that taxpayers are not entitled to overpayment interest on remittances designated as deposits. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) (stating that the "preference for avoiding surplusage constructions is not absolute" and should be abandoned where it would lead to an interpretation that is inconsistent with the plain text of the statute).

Nor would Ford's interpretation be consistent with the general policy and structure of Revenue Procedure 84-58, which presumptively treats all remittances as advance tax payments unless the taxpayer specifically requests that its remittance be treated as a deposit. *See* Rev. Proc. 84-58 § 4.01. As noted above, taxpayers face a trade-off when they send remittances: Submit the remittance as a deposit and retain the right to demand its immediate return while sacrificing the right to earn interest in the event the remittance exceeds the taxpayer's ultimate tax liability. Or, conversely, submit the remittance as an advance tax payment to ensure that the payment earns interest, with the risk that, if the IRS revises its proposed tax deficiency downward, the advance tax payment will only be returned through the IRS's formal refund process rather than upon immediate demand by the taxpayer. Ford's interpretation of section 5.05 not only distorts the text, it also would permit taxpayers to obtain the benefits of cash-bond deposits, which constitute an IRS dispensation, without suffering the detriment that cash-bond deposits entail. That would lay waste to the numerous provisions of Revenue Procedure 84-58 that bar taxpayers from collecting interest on remittances held as deposits.

The better interpretation of section 5.05 is simply that it does not apply to the circumstances of this case. At bottom, the imaginative theories that both parties propound— Ford's argument for interpretive symmetry between §§ 6601 and 6611, the government's theory

of constructive return, and Ford's theory of retroactive conversion—are all attempts to tackle the simple fact that the IRS's whimsical treatment of deposits and conversions might be *ultra vires* because the revenue procedures do not contemplate conversions, and the IRS appears to treat deposits differently in the contexts of underpayment and overpayment interest.  But this dispute is about the proper interpretation of § 6611; it is not about whether the IRS's conversion of deposits into advance tax payments is *ultra vires*.  If the IRS needs to update its revenue procedures to memorialize the practice of converting deposits into advance tax payments in order to eliminate disparities in the treatment of certain types of remittances, it should do so.  We will not adopt a strained reading of § 6611 merely to make slightly better sense of contradictory provisions in Revenue Procedure 84-58.

**4.**

Finally, Ford also claims to find support for its position in the enactment of section 842 of the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (codified at 26 U.S.C. § 6603), which provides that, contrary to previous practice, taxpayers who remit cash-bond deposits to the IRS and subsequently request the return of those funds are entitled to interest in certain circumstances.  Section 6603 provides for a lower interest rate for returned deposits as compared to the general overpayment interest rate applicable under § 6611.  *Compare* § 6603(d)(4), *and* § 6621(b), *with* § 6611(a), *and* § 6621(a)(1).  Ford contends that because § 6603 allows a taxpayer who requests the return of its deposit to recover interest from the remittance date, it makes little sense to interpret § 6611 to allow a taxpayer who converts a deposit—rather than asking for its return—to recover interest only from the conversion date.  A taxpayer who requests the return of a deposit would then be entitled to interest from an earlier date than the taxpayer who requests the deposit's conversion, thus illogically rewarding the taxpayer who seeks the return of its deposit over the taxpayer who actually converts its deposit into an advance payment of tax.

The government responds with its constructive-return theory—that a converted deposit is actually two sequential transactions, a constructive return of the deposit followed by immediate re-submission of that deposit as a tax payment.  Under that approach the taxpayer would be paid interest under § 6603 from the deposit date until the date of the constructive return and would

then be paid at the higher interest rate established in § 6621(a)(1) from the constructive-return date until the refund date. In other words, the government suggests that § 6603 allows for the payment of interest at two different rates for a converted deposit, while prior to the enactment of § 6603 interest would only be paid from the date of conversion forward.

Both Ford and the United States advance interpretations of § 6611 that would reconcile that statute and § 6603 with the IRS's apparent practice of converting deposits into advance tax payments. Yet § 6603 had not been enacted when Ford remitted its deposits, so we need not concern ourselves with the effect of that statute on the facts of this case. Taxpayers who remit deposits today may conclude that they can maximize their interest by requesting the return of their deposits instead of converting those deposits into advance tax payments. That choice was not available to Ford, however, and we will not adopt a warped interpretation of § 6611 merely to allow Ford to recoup interest that Congress only recently decided to award.

## IV.

The district court's decision is affirmed.

---

**CONCURRENCE**

---

ROGERS, J., concurring. I join the majority's opinion, except for Part III.A. For the compelling reasons given in the remainder of the majority's opinion, the Government does not owe interest on the amounts paid by Ford as a deposit. There is no need at all to address the applicability of the strict construction canon for waivers of sovereign immunity, and I would therefore not do so. *See* Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249 (2006).

Unnecessarily addressing the issue is particularly problematic in this instance, where the issue is close and conceptually difficult. I would not say, for instance, that the general purpose of sovereign immunity is only to shield the government from suit, and not from liability. Immunity of the United States in its own courts is a doctrine that serves separation-of-powers interests, and is not just a matter of court jurisdiction. In our three-branch scheme of government, courts generally have the final power both to say what the law is and to compel compliance with the law. But the legislature has a particularly strong primary responsibility with respect to the allocation of public funds, because of its responsiveness to popular views and its ability to weigh interests. This primary responsibility of the legislature to allocate public funds is reflected in the doctrine of sovereign immunity, which as a modern doctrine is almost entirely limited to money suits. Courts cannot take public funds and give them to private parties unless it is particularly clear that Congress intended for the courts to do so. This limit logically applies not only to whether a particular court has jurisdiction, but also to whether the private parties are entitled to the money. Sovereign immunity thus comprises not only a jurisdictional limit, but a substantive one as well.